RONALD GRANT, as Administrator of the Estate of PATRICIA GRANT, Deceased, et al., Appellants, v RICHARD GUIDOTTI et al., Defendants, and EDGARDO MACALINO, Respondent.

Second Department, February 26, 1979

## APPEARANCES OF COUNSEL

*Gutman & Gutman (S. Mac Gutman* of counsel), for appellants.

*Morris, Duffy, Ivone & Jensen (Patricia D'Alvia* of counsel), for respondent.

## OPINION OF THE COURT

SHAPIRO, J.

We affirm the summary judgment granted respondent Macalino by Mr. Justice FEIDEN, which was based upon two intermediate orders. One order granted the respondent summary judgment and the other order denied appellants' motion to amend the caption of the action to include Robert Grant as an individual plaintiff as well as a plaintiff in his representative capacity as administrator.

### PRELIMINARY STATEMENT

Patricia Grant died while under anesthesia for a Caesarian section on July 20, 1975 at Long Island College Hospital. The defendants, concededly, were not served with process commencing this action until 2 years and 22 days after her death. (The physician defendants other than Dr. Macalino were employees of the defendant hospital.)

In the complaint, the caption of which indicates that the action was brought as one for wrongful death,[1] there is included a cause of action wherein the husband, Ronald Grant, seeks damages because "plaintiff has been permanently deprived of the services of the decedent and has been permanently denied the comfort and happiness of her society and companionship." Preceding this allegation is one stating that "[p]rior to the times herein mentioned the decedent had been in good health and fully capable of performing and actually did perform all the usual duties of housewife in their dwelling." Thus, although the format of the caption and the complaint (in general) indicated that it was a wrongful death action for the benefit of the children and the widower, the

---

1. The plaintiffs named in the caption are "RONALD GRANT, administrator of the estate of PATRICIA GRANT, deceased, RONALD GRANT, JR. and SATASHANEQUA GRANT". The first paragraph of the complaint describes Ronald Grant as the "widower" and the other named persons as "two minor children".

latter was clearly also seeking separate damages for loss of consortium due to the death of his wife.

By separate motions, all the defendants moved to dismiss the complaint on the ground that a wrongful death action must be commenced within two years after the decedent's death (EPTL 5-4.1). Special Term held that as to the defendant hospital and its employees, plaintiffs' claim of estoppel raised an issue of fact which could only be determined after trial, but since there was no such issue as to respondent Macalino, summary judgment should be awarded to him.

In the moving affidavit on behalf of Macalino, reference was made to the fact that Ronald Grant's cause of action for loss of services indicated that he was suing in an individual capacity and that this contradicted the caption wherein he appeared solely as administrator. In response, plaintiffs, cross-moved, *inter alia,* to amend the caption of the complaint to read "Ronald Grant, individually, and as administrator". In support of the cross motion plaintiffs' attorney asserted that "it is clearly the law in New York that an action for loss of consortium is a separate action vested in the husband, which arises from the death of his spouse without regard to the causes of action under the wrongful death statute" and that a "cause of action for loss of consortium [for a period subsequent to the spouse's death] is not subject to the two-year time limitation of EPTL 5-4.1." These legal contentions constitute the issue on this appeal.

I

### WRONGFUL DEATH ACTION UNDER THE COMMON LAW

It is ancient legal history that under the English common law there was no right to recover damages for wrongful death, just as a cause of action for personal injuries did not survive the death of the injured person or of the tort-feasor (2 Harper and James, Law of Torts, p 1284). The origin of the rule that personal tort actions died with the person of the plaintiff or defendant is obscure (Holdsworth, Origin of Rule in *Baker v Bolton,* 32 LQ Rev 431; 3 Holdsworth, History of English Law [3d ed], pp 333-336, 576-585, 676-677). Prosser states that "[t]he best conjecture" is that the remedy for tort developed as an adjunct and incident to criminal punishment, which included the process of appeal of felony (which was a criminal proceeding instituted at the behest of a private injured party, includ-

ing the family of the victim of a homicide) and the action of trespass which succeeded it (Prosser, Torts [4th ed], p 898). In the nonindustrial society of medieval England, the death of one at the hands of another was usually the result of a homicide for which the defendant was executed and all his property confiscated by the Crown, thus leaving no assets from which the deceased's dependent family could receive compensation for the tort.

Although under early common-law actions in assumpsit did not die with the person, criminal proceedings did (3 Holdsworth, History of English Law [3d ed], p 577). Meanwhile "[t]respass or one of its off-shoots was coming to be the form of action used for all torts to person or property" and "trespass and its off-shoots were * * * obviously of a penal character * * * The result was that the rule as to non-survivorship was applied to all causes of action in tort whether to person or property" 3 Holdsworth, History of English Law [3d ed], p 578). The rationale (no matter how weak or unjust) for the nonsurvival of a tort action of the victim of a homicide, however, does not fully explain the denial of an action *to the dependent members of his family* who had lost the support and services upon which they had depended. In 1808, in *Baker v Bolton* ([1801] 1 Camp 493) Lord ELLENBOROUGH held that the negligently caused death of a man did not give rise to a civil action against the wrongdoer by the dependent members of his family. Although this was a nisi prius decision, and no reason was given for the conclusion thus stated, it was accepted as representing the English common law and was not presented for reconsideration before the English courts until 1873 *(Osborn v Gillett,* LR 8 Ex 88; see Duke LJ [1965], p 674), by which time it became academic in most cases since Lord Campbell's Act (known in England as The Fatal Accidents Act and later in this country as the wrongful death statute) was enacted in 1846.

In the first half of the 19th century courts throughout the United States generally followed the *Baker* rule even though it was not clearly part of the English common law at the time of America's independence. There were only a few holdings both before and after *Baker* to the contrary (see *Ford v Monroe,* 20 Wend 210; *Crofs v Guthery,* 2 Root [Conn] 90; *Shields v Yonge,* 15 Ga 349).

One proffered explanation for the *Baker* rule was given by an English Judge in his charge to a jury. He stated that " 'the

ancient common law maxim [was] that the value of life was so great, as to be incapable of being estimated by money' " (as quoted in *Green v Hudson Riv. R. R. Co.,* 28 Barb 9, 18). Another was that it was "the policy of the law to secure a greater safety to life and limbs by merging or drowning the right to damages by a civil action in the felony resulting from the killing of a human being by the negligent act of another, thus insuring the co-operation of the next of kin * * * in a vigorous prosecution of the criminal, and preventing the composition or settlement of such offenses" *(Green v Hudson Riv. R. R. Co.,* 2 Abb Ct App 277, 279).

To modern ears the fatuity and injustice of such explanations are obvious. In any event, as stated in *Moragne v States Mar. Lines* (393 US 375, 382-386): "Legal historians have concluded that the sole substantial basis for the rule at common law is a feature of the early English law that did not survive into this century—the felony-merger doctrine * * * Since all intentional or negligent homicide was felonious, there could be no civil suit for wrongful death * * * [I]t seems clear * * * that the rule of *Baker v. Bolton* did derive from the felony-merger doctrine, and that there was no other ground on which it might be supported even at the time of its inception * * * The historical justification marshaled for the rule in England never existed in this country [since] in this country the felony punishment did not include forfeiture of property; therefore, there was nothing * * * to bar a subsequent civil suit * * * Nevertheless, despite some early cases in which the rule was rejected as 'incapable of vindication,' * * * American courts generally adopted the English rule as the common law of this country as well [despite the fact that] the courts failed to produce any satisfactory justification for applying the rule in this country * * * The most likely reason that the English rule was adopted in this country without much question is simply that it had the blessing of age * * * The American courts never made the inquiry whether this particular English rule, bitterly criticized in England, 'was applicable to their situation,' and it is difficult to imagine on what basis they might have concluded that it was."

## II

### THE PRECURSORS OF THE WRONGFUL DEATH STATUTES

By the middle of the 19th century, the rapid industrializa-

tion and growth of the steam railway system throughout England and the United States resulted in a tremendous increase in the number of accidents and deaths. Even before the enactment of Lord Campbell's Act in 1846, the State Legislatures of this country "moved into action in this single field with surprising promptness and often with but little notion of what legal theory, if any, would be appropriate to meet the needs of bereaved families clamoring for assistance" (Malone, American Fatal Accident Statutes—Part I: The Legislative Birth Pains, Duke LJ [1965], pp 673, 678). These statutes singled out railroads and other carriers as the entities that would be held responsible for the payment of damages in civil actions where there had been an accidental death. Gradually, and more particularly after the passage of Lord Campbell's Act, this concentrated attack on railroads and public carriers was transferred into general statutes permitting recovery for wrongful death against any defendant responsible for the deaths (Malone, American Fatal Accident Statutes—Part I: The Legislative Birth Pains, Duke LJ [1965], p 682).

## III

### LORD CAMPBELL'S ACT 9 & 10 VICT, CH 93 (1846)

This statute was entitled "An Act for compensating the Families of Persons killed by Accidents." Sections I to III inclusive read:

"I. WHEREAS no Action at Law is now maintainable against a Person who by his wrongful Act, Neglect, or Default may have caused the Death of another Person, and it is oftentimes right and expedient that the Wrongdoer in such Case should be answerable in Damages for the Injury so caused by him: Be it therefore enacted by the Queen's most Excellent Majesty, by and with the Advice and Consent of the Lords Spiritual and Temporal, and Commons, in this present Parliament assembled, by the Authority of the same, That whensoever the Death of a Person shall be caused by wrongful Act, Neglect, or Default, and the Act, Neglect, or Default is such as would (if Death had not ensued) have entitled the Party injured to maintain an Action and recover Damages in respect thereof, then and in every such Case the Person who would have been liable if Death had not ensued shall be liable to an action for Damages, notwithstanding the Death of the Person injured,

and although the Death shall have been caused under such Circumstances as amount in Law to Felony.

"II. And be it enacted, That every such Action shall be for the Benefit of the Wife, Husband, Parent, and Child of the Person whose Death shall have been so caused, and shall be brought by and in the name of the Executor or Administrator of the Person deceased; and in every such Action the Jury may give such Damages as they may think proportioned to the Injury resulting from such Death to the Parties respectively for whom and for whose Benefit such Action shall be brought; and the Amount so recovered, after deducting the Cost not recovered from the Defendant, shall be divided amongst the beforementioned Parties in such Shares as the Jury by their Verdict shall find and direct.

"III. Provided always, and be it enacted, That not more than One Action shall lie for and in respect of the same Subject Matter of Complaint, and that every such Action shall be commenced within Twelve Calendar Months after the Death of such deceased Person."

## IV

### THE FIRST NEW YORK WRONGFUL DEATH STATUTE (L 1847, CH 450)[2]

The original act was as follows:

"AN ACT requiring compensation for causing death by wrongful act, neglect or default * * *

"§ 1. Whenever the death of a person shall be caused by wrongful act, neglect or default, and the act, neglect or default, is such as would (if death had not ensued) have entitled the party injured to maintain an action and recover damages, in respect thereof, then and in every such case, the person who, or the corporation which would have been liable, if death had not ensued, shall be liable to an action for damages, notwithstanding the death of the person injured, and although the death shall have been caused under such circumstances as amount in law to felony.

"§ 2. Every such action shall be brought by and in the names of the personal representatives of such deceased per-

---

2. In due course this statute, as amended, became section 1902 of the Code of Civil Procedure and then section 130 of the Decedent Estate Law (L 1920, ch 919); it is now EPTL 5-4.1 (L 1966, ch 952).

son, and the amount recovered in every such action shall be for the exclusive benefit of the widow and next of kin of such deceased person, and shall be distributed to such widow and next of kin in the proportions provided by law in relation to the distribution of personal property, left by persons dying intestate; and in every such action the jury may give such damages as they shall deem fair and just, with reference to the pecuniary injury resulting from such death to the wife and next of kin of such deceased person: provided that every such action shall be commenced within two years after the death of such deceased person."

## V

### COMPARISON OF THE TWO STATUTES

The mirroring in section 1 of the New York statute (L 1847, ch 450) of the nonpreamble portion of paragraph 1 of Lord Campbell's Act indicates that the legislative draftsmen had before them the text of the English statute. We may therefore assume that they accepted the parliamentary conclusion that "no Action at Law is *now* maintainable against a Person who by his wrongful Act, Neglect, or Default may have caused the Death of another Person" (emphasis supplied) and that that conclusion applied to New York law as it existed before the enactment of the New York statute. The reason for the absence of the "Whereas" clause in the New York statute is, apparently, that it was not the general practice for the New York Legislature to set forth explanatory "whereases" in the text of a statute.

It should be especially noted that in the New York statute: (1) the damages were limited to the "pecuniary injury result-ing from such death"[3] (while the English statute had no such limitation); (2) the action was only for the benefit of the wife and next of kin (while the English statute included the surviv-ing husband as well);[4] and (3) the statute stated its own limitation period, i.e., "two years after the death of such deceased person" (while the English limitation period was one

---

3. By chapter 256 of the Laws of 1849, the recoverable damages could not exceed $5,000. However, by section 18 of article I of the New York Constitution (1894), it was provided that "[t]he right of action now existing to recover damages for injuries resulting in death, shall never be abrogated; and the amount recoverable shall not be subject to any statutory limitation."

4. It was not until 1870 that the statute was amended to include the husband as one of the persons for whose benefit the action could be maintained (L 1870, ch 78).

year). Thus, the New York statute was *substantively* less protective than the English statute, but *adjectively* more protective in that it doubled the limitation period to two years.[5]

## VI

### GREEN V HUDSON RIV. R. R. CO. (28 BARB 9, AFFD 2 ABB CT APP 277)

This landmark case, consistently followed in this State, held that there is no common-law action for wrongful death and that the sole remedy is that provided by New York's wrongful death statute.[6]

In *Green* the husband *(supra,* p 14) alleged a common-law right to recover for deprivation of "the comfort, benefit and assistance of his said wife, in his domestic affairs, which he might * * * have had". His wife was a passenger on a train on defendant's railroad. She died instantaneously as the result of a collision. The railroad interposed a general demurrer to the effect that the complaint did not state facts sufficient to constitute a cause of action. The provisions of the New York State wrongful death act at that time (1858), as afore-stated, did not provide that a husband was one of the persons for whose benefit the personal representative of the estate could institute the action.

The lower court stated (28 Barb 9, 14) that "[t]he case * * * presents the naked question whether, at common law, a husband can maintain an action for an injury to his wife, where the effect is her instantaneous death". Plaintiff relied *(supra,* p 15) "upon the broad principle that there can be no wrong without an appropriate remedy * * * and that as the act of the defendant did not amount to a felony, the civil remedy is in no respect lost or impaired."

In dismissing the complaint, the *Green* court (28 Barb 9, *supra)* reviewed the common law of England as expressed in *Higgins v Butcher* ([1607] Yelv 89) and *Baker v Bolton* ([1808]

---

5. Unfortunately for plaintiffs, such increased period is still not enough to maintain this suit.

6. *Green* has been consistently followed in this State *(Baird v Daly,* 57 NY 236, 248; *Sorensen v Balaban,* 11 App Div 164, 165; *Ohnmacht v Mount Morris Elec. Light Co.,* 66 App Div 482, 484; *Kilberg v Northeast Airlines,* 9 NY2d 34, 43-44 [concurring opn of FULD, J.]; *Osborn v Kelley,* 61 AD2d 367, 370; *Ratka v St. Francis Hosp.,* 44 NY2d 604).

1 Camp 493, *supra)* and alluded to the obsolesence of the felony-merger rationale. The court nevertheless stated that it was sufficient for its purpose that the rule had long existed in England as evidenced by the recital in the first section of Lord Campbell's Act that "no Action at Law is now maintainable against a Person who by his wrongful Act, Neglect, or Default may have caused the Death of another Person, and it is oftentimes right and expedient that the Wrongdoer in such Case should be answerable in Damages". The court *(Green v Hudson Riv. R. R. Co.,* 28 Barb 9, 18, *supra)* then added that: "So good a lawyer as he who drafted this act, would not have put such a proposition in the shape of a legal enactment, nor the parliament of England engaged in a work of manifest supererogation, unless it had been true that by the law of the land * * * no remedy whatever existed for the wrong for which it was the purpose of the act to provide a remedy."

The court then reviewed the cases of the various States, and concluded that all but one *(Ford v Monroe,* 20 Wend 210, *supra)* recognized the unquestioned existence of the common-law rule. In disagreeing with the *Ford* case, the court *(supra,* pp 20-21) said that the case was an anomaly "sustained by no precedent, and in plain conflict with all previous authority" and that the *Ford* court's discussion as to "damages, is in four lines, and is merely to the effect that as they are specially laid, and were proved to have been the consequence of the principal act, they came within the well-settled rule of special damages; which amounts to little more than saying that they were special, because they were specially laid—a truism that it required no great effort or legal learning to announce. A case thus presented, and thus disposed of, can hardly be accepted as an authority which shall overthrow a principle of the common law, so long settled and acquiesced in as to have become quite elementary."

The court *(supra,* pp 21-22) then held that it was constrained to "abide by the common law rule, that an action by a husband for the loss of his wife by the careless and negligent act of a third party, can only be sustained where some period intervenes between the time of the injury and the time of dissolution, during which he could be said to have suffered the loss of her service and society, and incurred expense and underwent anxiety and distress on her account." The court *(supra,* p 22) concluded that since "the law will not bend to accommodate our private views, or gratify our personal de-

sires, I have no alternative but to administer the law as I find it—no dispensation from its injunctions to stand by its ancient landmarks."

*Green v Hudson Riv. R. R. Co.* was affirmed in 1866 (2 Abb Ct App 277).[7] The Court of Appeals, in reviewing the rationale of the *Green* decision in the court below, concluded (2 Abb Ct App 277, 282) that "[t]he case required no further discussion than is so well and carefully given in 28 *Barbour,* and I am conscious of having added very little to the subject, although I have examined it at some length."

The concurring opinion of Judge HUNT concludes as follows *(supra,* pp 286-287): "If the rule of the common law is harsh or narrow, it is for the legislature to alleviate the evil, and enlarge the remedy. This has been done in some degree in this State, and in Great Britain much more extensively by the act 9 and 10 Victoria, ch. 93. However strong may be our sympathy with the plaintiff, we are compelled to content ourselves with expounding the law as we find it. The right to correct or improve it belongs to another department of the government."

Judge HUNT thus indicated that if New York desired to include a widower as a beneficiary of the statutory wrongful death action (as Lord Campbell's Act had done), it would have to do so by amending its statute. Such an amendment was thereafter enacted into law in 1870 (see n 4).

# VII

## MORAGNE V STATES MAR. LINES (398 US 375)

The door to a tenable claim that there could be a nonstatutory wrongful death action was opened in *Moragne.* The court, overruling its 1886 holding in *The Harrisburg* (119 US 199), decided that *general maritime law* afforded a nonstatutory cause of action from wrongful death. The court (398 US 375, 386-387, *supra)* criticized the *Harrisburg* ruling for its failure to recognize "that there should * * * be a different rule for admiralty from that applied at common law. Maritime Law had always, in this country as in England, been a thing apart from the common law * * * [T]he common-law rule, critized

---

7. The eight-year hiatus is explained at 2 Abb Ct App 277, where it is stated that the decision at 28 Barb 9 "was affirmed on appeal to the general term; and the plaintiff recovered a verdict, which, however, was set aside on other grounds, and a new trial ordered".

as unjust in its own domain, might wisely have been rejected as incompatible with the law of the sea."[8]

The essence of the *Moragne* decision is that there was an anomaly in the Death on the High Seas Act, which provided a statutory wrongful death action, including unseaworthiness as a basis for recovery, because it did not apply to the death of a longshoreman working on a ship in territorial waters, due to the unseaworthiness of the vessel. In reaching its conclusion the court *(supra,* p 390) said that since every State had a wrongful death statute and since Congress had created actions for the wrongful death of railroad employees and merchant seamen on the high seas "there is no present public policy against allowing recovery for wrongful death". The court therefore concluded *(supra,* p 393) that "[w]here death is caused by the breach of a duty imposed by federal maritime law, Congress has established a policy favoring recovery in the absence of a legislative direction to except a particular class of cases". The court then concluded that since Congress had given no such affirmative indication, the public policy manifested both in the State and Congressional statutes should apply to death in territorial waters due to unseaworthiness.

*Moragne,* however, is a far cry from our case since New York *has* a statutory cause of action under which one may recover for the wrongful death of one's spouse to the extent of the pecuniary loss and has included within the terms of the statute a condition that the action be instituted within a stated time.

## VIII

### GAUDETTE V WEBB (362 MASS 60)

In large part relying on *Moragne v States Mar. Lines* (398 US 375, *supra),* the Massachusetts court in *Gaudette (supra,* p 71) (alone among the 30 States which have considered the issue [see Ann. 61 ALR3d 906, 908-910]) held that "the law in this Commonwealth has also evolved to the point where it may now be held that the right to recovery for wrongful death is of common law origin".

*Gaudette* involved an action brought by the widow, as administratrix, for wrongful death of her husband in behalf of their three minor children. The limitation period in the

---

8. This indicates that *Moragne* may not properly be cited as applying to *common-law* wrongful death actions.

wrongful death statute as to certain automobile accidents was two years, but the action was instituted 2 years and 11 months after the death. The court (supra, pp 69-70) emphasized "[t]he lack of any discernible basis for the doctrine of *Baker v. Bolton,* and the harsh results it frequently produced" and quoted with approval from Roscoe Pound's commentary (13 NACCA LJ 162, 189) that " '[t]o think of recovery for wrongful causing of death as something exceptional not to be treated as part of the general law but to be provided for specifically as to application to every item of recent legislative improvement of the law is an anachronism. Today we should be thinking of the death statutes as part of the general law.' " The court therefore applied the tolling provision to which a minor was entitled and held (supra, p 72) that it would postpone "the running of the statute as to their right to recovery through a representative just as it would toll its running if their right of action was direct." The court, however, held (supra, p 72) that the widow "[h]aving let the statute of limitations expire before seeking appointment as administratrix * * * should not be allowed to take advantage of the tolling provision applicable only to her minor children."[9]

## IX

### NEAL V BUTLER AVIATION INT. (422 F SUPP 850)

The United States District Court for the Eastern District of New York, after citing *Moragne v State Mar. Lines* (398 US 375, *supra)* and *Gaudette v Webb* (362 Mass 60, *supra)* with approval, stated (supra, pp 855-856) that although "[t]here is necessarily an element of speculation in essaying to decide a question of state law on a point in which the cases afford little or no guidance * * * it is considered that the New York Courts when directed to *Moragne* and *Gaudette* would reach the same conclusion. The rationale of *Moragne* is compelling, and *Gaudette* is clear that the existence of a wrongful death statute (an exotic and restrictive one, in fact) does not suppress the recognition of the common right of action * * * The New York statute is intended as a statute of beneficence; it makes good a supposed defect in the common law, and, while it has not the most expansive measure of damages, it discloses

---

9. Thus, even under *Gaudette,* the plaintiff widower here would have found his cause of action outlawed by the Statute of Limitations.

no purpose to annul rights that might exist independently of the statute. *In these legal circumstances it may not be held that the interests of the infants are barred by lapse of time"* (emphasis supplied).

The court's "speculation" was not correct (see *Ratka v St. Francis Hosp.,* 44 NY2d 604).

# X

## RATKA V ST. FRANCIS HOSP. (44 NY2D 604)

In *Ratka* the decedent died while undergoing surgery, leaving surviving a wife and seven children, six of whom were infants. More than two years passed without anyone seeking appointment as a representative of the decedent's estate for the purpose of instituting a wrongful death action. It was not until almost three years after the death that letters of administration were granted and service was made. Plaintiff urged the court *(supra,* p 610) "to establish a common-law cause of action for wrongful death, notwithstanding that our Legislature has expressly authorized such claims for over a century in statutes culminating in the present EPTL 5-4.1". As a concomitance to an alleged *common-law* cause of action for wrongful death, plaintiff asserted that the action was tolled for the benefit of those of the decedent's children who were infants.

Judge COOKE (now Chief Judge), writing for a unanimous court, noted *(supra,* p 610) that although Massachusetts "has established a common-law cause of action even though its legislative body had permitted such claims by statute * * * and despite the suggestion of other courts that 'the New York courts when directed to *Moragne* and *Gaudette* would reach the same conclusion' *(Neal v Butler Aviation Int.,* 422 F Supp 850, 855; see, e.g., *Barnette v Butler Aviation Int.,* 89 Misc 2d 350), we decline plaintiff's invitation to change the law of this State."

He stated *(supra,* p 612) that the court must "reject the request to establish a common-law cause of action for wrongful death. The decisions of other jurisdictions are, in our view, based on considerations not present here, and, to the extent that they may suggest a contrary result, we respectfully decline to follow in their steps * * * [I]t is neither necessary nor appropriate to change established law as a means of

saving this cause of action for wrongful death from the bar of the Statute of Limitations."

## XI

### VENTURA V CONSOLIDATED EDISON CO. (65 AD2D 352)

The *Ventura* case was decided by the First Department after the oral argument of this case in this court. By way of a supplemental brief, appellants stress the *Ventura* decision as determinative here because, they say, that case holds that loss of consortium is compensable in a *common-law* wrongful death action. However, *Ventura* did not basically involve the question of the Statute of Limitations. The gist of that decision was that loss of consortium is a pecuniary injury and thus is compensable in a *wrongful death* action. Thus, properly read, *Ventura* stands for the proposition that loss of consortium where death is immediate, is merely an additional claim of damages sustained by the surviving spouse which may be asserted in a timely instituted wrongful death action (i.e., an action instituted within the time limitations specified in the statute). Therefore, *Ventura* does not support the contention that a spouse may recover for loss of consortium for the instantaneous death of a decedent as a common-law cause of action maintained independently of the wrongful death statute.[10]

## XII

### THE LAW

*Ratka v St. Francis Hosp.* (44 NY2d 604, *supra)* has clearly

---

10. In reaching its conclusion, the First Department relied in part upon our decision in *Martins v Ford* (53 AD2d 887), stating: "As already noted, the Second Department, in *Martins v Ford* (53 AD2d 887) concluded that a plaintiff widow, suing individually and as administratrix of the estate of her husband, had a valid claim for loss of consortium." While the language in our memorandum decision was not as clear as it might have been, we reached no such conclusion. Our phraseology was used in the context of a record which left an inference that the decedent might have survived for some period of time after the accident. In a subsequent case, *Bell v Cox* (54 AD2d 920), we made our views clear when we said: "The plaintiff recognizes that in *Amerman v Lizza & Sons* (45 AD2d 996, 998) this court, under the rule of *stare decisis,* held that it could not allow a recovery under the terms of the statute (EPTL 5-4.3) for grief, loss of society or loss of companionship, but argues that we should change our views. If the law in this regard is to be changed it must be by an amendment of the statute, or by its reinterpretation by the Court of Appeals (see *Sideman v Guttman,* 38 AD2d 420)." In *Liff v Schildkrout* (— AD2d —), this court is holding to the same effect.

shown that the tentative incipient doctrine that there is a common-law death action in New York suffered a stillbirth. In addition, it should be noted that our case does not involve the question of whether the tolling provisions may be utilized to expand the period of institution of suit for the benefit of a minor (cf. *Gaudette v Webb,* 362 Mass 60, *supra)* nor to expand the beneficiaries of the wrongful death statute (cf. *Green v Hudson Riv. R. R. Co.,* 28 Barb 9, affd 2 Abb Ct App 277, *supra)* but simply the naked and much more simple issue as to whether a Legislature has the plenary right to enact a Statute of Limitations as to *any* action, whether or not the action is historically based on common law.

As stated in American Jurisprudence Second (Limitation of Actions, vol 51, § 12, p 598): "[I]t is well recognized and unquestioned that the legislature of each state has the power to enact statutes of limitation effective within that state. The establishment of statutes of limitation is always a legislative prerogative."

Although constitutional questions may arise as to the disturbance of vested rights where a limitation period had been lengthened or shortened (see 35 NY Jur, Limitations and Laches, §§ 21, 22) it is unquestioned that the periods of limitation, per se, are solely for the Legislature to decide.

Thus, the issue posed by the plaintiffs as to whether a right to recover for the wrongful death of another constituted the *true* common law (i.e., whether it was a brooding presence awaiting enunciation by a learned and courageous court) is largely academic. If in 1846, one year before enactment of the wrongful death statute in New York, the highest court of this State had held that there *was* a common-law wrongful death action, the limitation period in the succeeding year's statute would *still* have applied to the beneficiaries listed in the statute. The 1847 wrongful death statute, righting an ancient wrong, cannot be doubly ignored (as plaintiffs seek), *substantively* (so as to be drowned in a common-law right), and *adjectively* (so as to ignore the limitation period therein).

Accordingly we hold that in this case the plaintiffs' cause of action is barred by the applicable Statute of Limitations (two years) and that since this action was concededly commenced 2 years and 22 days after the death of the decedent, Special Term was correct in awarding summary judgment to the respondent dismissing the complaint. For the same reason the

court was also correct in denying the motion to add the widower as a plaintiff in his individual capacity.

DAMIANI, J. P., TITONE and SUOZZI, JJ., concur.

Appeals from two orders of the Supreme Court, Kings County, both dated July 7, 1978, dismissed (see *Matter of Aho,* 39 NY2d 241, 248).

Judgment of the same court, entered August 7, 1978, affirmed.

Respondent is awarded one bill of $50 costs and disbursements to cover all appeals.