Rita ROBINSON, Individually and as Administratrix of the goods, chattels and credits that were of Joseph Robinson, deceased, Plaintiff,

v.

Rubin SHAPIRO, Harold Schneider, Irving Newman, Samuel Greenberg and Julius G. Fishman, doing business as Village Towers Company (a partnership), Defendants.

Harold SCHNEIDER, doing business as Village Towers Company (a partnership), Third-Party Plaintiff,

v.

WASOFF CONTRACTORS, INC. and Modern Sheet Metal, Inc., Third-Party Defendants.

No. 78 Civ. 2522.

United States District Court, S. D. New York.

Jan. 23, 1980.

Pazer & Epstein, P. C., New York City, for plaintiff.

Lewis I. Wolf, Weisman, Celler, Spett, Modlin & Wertheimer (of counsel), New York City, for defendants and third-party plaintiff.

Samuel Brill, New York City, Trial Counsel, Segan, Culhane, Nemerov & Geen, New York City, for Wasoff Contractors, Inc.

Burlingham, Underwood & Lord, New York City, for Modern Sheet Metal, Inc.

LASKER, District Judge.

On the night of January 8, 1978, high winds blew down portions of the smokestack at the apartment building at 15 Charles Street in Manhattan. The next morning a representative of the owner of the building, Village Towers Company ("Village Towers"), telephoned the contractor who had built the smokestack, Wasoff

Contractors, Inc. ("Wasoff"), who in turn called the subcontractor who had actually put it up. The subcontractor, Modern Sheet Metal, Inc. ("Modern"), immediately sent a crew to 15 Charles Street to clean up the debris that had fallen onto the roof of the single story garage connected to the apartment building. The crew was under the supervision of Joseph Robinson.

To get to the top of the garage, the crew used a metal staircase that led from the sidewalk next to the driveway leading into the garage to a gap in the parapet around the roof of the garage. Leaning against the parapet, and blocking the gap at the top of the staircase, were several sections of iron fence, including a "gate" that was wedged into the gap and tied to the sections of fence behind it. As a consequence, the men in Modern's crew had to step up from the top of the staircase onto the parapet and walk along it to the end of the sections of fence leaning against it, where they could step down off the parapet onto the garage roof.

In the afternoon, the men finished their work and left the roof. Robinson was the last to leave, and as he was stepping down from the parapet to the top of the staircase, using the iron "gate" wedged into the gap in the parapet to support himself, the "gate" came loose, and Robinson fell down the staircase with the "gate" on top of him. He died several days later.

Robinson's wife brought this wrongful death action against Village Towers and Wasoff, and Village Towers impleaded Wasoff and Modern. At the close of the evidence, Village Towers' third party complaint against Wasoff and Modern was dismissed, but Ms. Robinson's claim against Wasoff was allowed to go to the jury. The jury returned a verdict against both defendants for damages of $1,180,000., representing $750,000. for loss of support and services, $400,000. for loss of consortium, and $30,000. for Robinson's pain and suffering. The jury found that Village Towers' negligence was 88% responsible for Robinson's death, and Wasoff's 12%. The jury expressly found that Robinson himself had not been negligent.

Village Towers moves pursuant to Rule 59 for a new trial, contending that the dismissal of its third party complaint was improper since "there was ample evidence of the culpability of both Wasoff and Modern contributing to the fatal accident," and because the court erred in two evidentiary rulings. In addition, Village Towers asserts that under New York law damages for loss of consortium cannot be recovered in a wrongful death action, and that in any event the jury's awards for lost support and loss of consortium were excessive. Finally, Village Towers argues that the jury charge was defective in several respects. Wasoff moves pursuant to Rule 50 for judgment notwithstanding the verdict, on the grounds that the evidence does not support the jury's finding that it was negligent.

Village Towers' motion is denied. Wasoff's is granted.

I.

██ Village Towers first contends that dismissal of its third party complaint against Wasoff and Modern was improper because "there was ample evidence of the culpability of both Wasoff and Modern." The evidence established that officers of Wasoff and Modern visited 15 Charles Street briefly on the day of the accident, and went onto the roof of the garage just as the men working there did. They apparently did not recognize the danger posed by the fence and "gate," and allowed the crew to continue working despite the impediment to ingress and egress from the work site. Bearing in mind that Village Towers bore the burden of proving negligence on the part of Wasoff and Modern, we adhere to our conclusion at the close of the evidence that no reasonable juror could find, on this evidence, that the failure of the officers of Wasoff and Modern to recognize that the existence and position of the fence might be dangerous constituted negligence on their parts.

For the same reasons, Wasoff's motion for judgment n. o. v. is granted, and the jury's verdict finding Wasoff 12% responsible for Robinson's death is set aside. As Wasoff argues in support of its motion for judgment n. o. v., the dismissal of Village

Towers' third party action against it on the grounds that there was no evidence from which a reasonable juror could conclude that Wasoff was negligent was inconsistent with the decision to allow Ms. Robinson's claim against Wasoff to go to the jury. This procedure was adopted despite the court's conviction that the evidence against Wasoff could not sustain a finding of negligence, to obviate the need for a new trial on apportionment in the event the Court of Appeals disagreed.[1]

It must be noted that judgment for Wasoff n. o. v. on the issue of negligence does not disturb the jury's finding that Wasoff was strictly liable to the plaintiff under sections 240 and 241.6 of New York's Labor Law. It does, however, affect the apportionment of liability under those provisions. In the event Village Towers could not satisfy the judgment in full, Wasoff would be obliged to make up the difference, despite our ruling to the effect that it was 0% negligent. However, Wasoff is liable under the Labor Law only if it was acting as a "general contractor" on the day of the accident, a question on which the court has to date reserved judgment. Since it is clear that Village Towers is adequately insured (to $2,000,000.),[2] it is not necessary to decide whether Wasoff was acting as "general contractor" on January 9, 1978, since even if it was, it would not have to satisfy any portion of the judgment.

## II.

 Village Towers contends that it was error not to submit to the jury the contract between Village Towers and Wasoff for the original construction of the smokestack, be-

cause "examination of the contract would have demonstrated that Wasoff was on the scene not out of idle curiosity but rather in order to meet its contractual obligations to the owners" under the warranty clause in the contract.[3]

Our conclusion that the evidence does not support a finding of negligence on Wasoff's part is unaffected by consideration of Wasoff's possible obligations under the warranty clause. Regardless of the motives that brought Wasoff's officer to 15 Charles Street on January 9th, the fact remains that the evidence adduced at trial will not support a conclusion that any act or omission attributable to Wasoff constituted negligence which contributed to Robinson's death. Accordingly, the question whether the contract should have been submitted to the jury is moot.

We note, however, that the rationale quoted above for allowing the jury to see the contract was never articulated at trial. Moreover, the case went to the jury on the theory that Wasoff was the general contractor hired to repair the smokestack.[4] The knowledge that Wasoff was obliged to do so under an earlier contract would have added nothing material to the jury's deliberations.

## III.

Village Towers next argues that it was prejudiced by the improper admission of the hearsay testimony of James Castro. The gist of Village Towers' argument is that since the challenged testimony would have been admissible under a proposed exception

1. See Trial Transcript at 713.

2. See Trial Transcript at 668.

3. Defendant, Village Towers Company, Memorandum of Law at 9. Village Towers asserts that this error was compounded by Wasoff's counsel's summation, which stressed Wasoff's minimal contact with the events of January 9, 1978, and the court's charge. As to the claim that Wasoff's summation inaccurately portrayed Wasoff's role on the day of the accident, no objection on this point was made at trial, as it should have been if it were to be pressed. Moreover, Village Towers' summation followed Wasoff's, and Village Towers' counsel had the

opportunity, which he availed himself of, to argue that Wasoff's connection was not simply one of "idle curiosity." As to the charge, the only objections made at trial in this regard were to portions of the charge summarizing Wasoff's contention. The other portion to which Village Towers now objects was not challenged at trial.

4. Trial Transcript at 835 ("Village Towers claims that if it is held liable its liability should be apportioned in part or wholly against Wasoff Contractors, *which it hired to do the repair job that day*." (Emphasis added)).

to the hearsay rule that was rejected by Congress, it was improper to admit it under the "catch-all" provisions of Rule 803(24) and Rule 804(b)(5). While we consider this argument unsound, it proceeds in any event from a mistaken premise.

■ Although Village Towers describes the rejected exception to the hearsay rule (Proposed Rule 804(b)(2)) as one that "would have allowed hearsay evidence of the declarant's *contemporaneous* sense perceptions to be introduced whenever the declarant was unavailable" (emphasis added), the proposed rule actually dealt with statements of "*recent* perception,"[5] and must be distinguished from Rule 803(1), which deals with statements of "present sense impression." The latter rule, which was adopted by Congress, provides that "a statement describing or explaining an event or condition made while the declarant was perceiving the event or condition, or immediately thereafter," is not excluded, even when the declarant is available. Fed.R.Evid. 803(1). Even if Castro's testimony was not admissible under the "catch-all" exceptions to the hearsay rule, it was admissible under this provision.

Castro testified that Robinson, the decedent, told him that Village Towers' building superintendent, Rendo, had forbidden the crew to enter or leave the work site through his apartment, or to take down the fence. There is no "double hearsay" here because Rendo's statement was a "verbal act"—it was an "event" that established the "condition" under which the men were to work. Robinson's statement to Castro, then, was "a statement describing or explaining an event or condition" made immediately after the "event" and contemporaneously with the "condition." It is just the

sort of statement contemplated by Rule 803(1): one nearly simultaneous with the event it described, and trustworthy because there was no time for the declarant's memory to falter, little opportunity and no apparent motive for him to dissemble, and occasion for the person to whom the statement was made independently to observe the condition which the statement described or explained (here, the fact that the crew had to go around the fence to get to the work site.).[6]

Village Towers makes much of the fact that it could not cross-examine Robinson regarding his conversation with Rendo, and complains that "[w]e are left with many unanswered questions about this conversation while the person who could possibly supply the answer to these questions about his version of the conversation is dead."[7] This complaint is somewhat disingenuous, since *Rendo* is not dead, and could certainly have supplied his own version of the conversation at trial. Both Ms. Robinson and Modern gave Village Towers formal notice that they intended to introduce Robinson's statement, and the court ruled prior to trial that it could be admitted. In these circumstances, it might be expected that Village Towers, if it believed Rendo's version would differ substantially from Robinson's, would have arranged to have him testify. In fact, Modern served interrogatories on Village Towers six weeks before the trial requesting the address of all employees at 15 Charles Street, including Rendo, who Modern believed was still the superintendent there. No response was ever received from Village Towers, and it was only on the first day of trial that it was learned from Village Towers that Rendo had left its employ, and could not be located. Towards the close of

**5.** Proposed Rule 804(b)(2) would have provided:

"The following are not excluded by the hearsay rule if the declarant is unavailable as a witness:

(1) . . .

(2) "STATEMENT OF RECENT PERCEPTION. A statement, not in response to the instigation of a person engaged in investigating, litigating, or settling a claim, which narrates, describes, or explains an event or condition recently perceived by the declarant, made in good faith, not in contemplation of pending or anticipated litigation in which he was interested, and while his recollection was clear."

**6.** *See* 4 Weinstein's Evidence ¶ 803(1)[01] (1979).

**7.** Defendant, Village Towers Company, Memorandum of Law at 13.

the trial, however, when Rendo's whereabouts again became an issue, the court was able, in a matter of hours, to locate him in Florida, through the new superintendent at 15 Charles Street.

The challenged testimony was properly admitted.

## IV.

■ Village Towers contends that under New York law damages for loss of consortium cannot be recovered in a wrongful death action. Although there are New York cases which support Village Towers' position, their reasoning is not convincing. We are confident that the course the New York courts will follow is the one soundly and succinctly plotted in *Ventura v. Consolidated Edison Co.,* 65 A.D.2d 352, 411 N.Y. S.2d 277 (1st Dept.1978) and *Lehman v. Columbia Presbyterian Medical Center,* 93 Misc.2d 539, 402 N.Y.S.2d 951 (Sup.Ct.N.Y. Co.1978). *See* Kelner & Kelner, Loss of Consortium in Wrongful-Death Cases, N.Y. L.J., January 9, 1980 (Vol. 183, No. 6) at 1, col. 1.[8]

It is not necessary to repeat here in detail Justice Sullivan's reasoning in *Ventura.* Recovery in a wrongful death action is limited to "fair and just compensation for the pecuniary injuries resulting from the decedent's death to the persons for whose benefit the action is brought." N.Y.Est., Powers & Trusts Law § 5–4.3. The question, then, is simply whether loss of consortium is a "pecuniary injury" within the meaning of the statute. Relying on *Millington v. Southeastern Elevator Co.,* 22 N.Y.2d 498, 293 N.Y.S.2d 305, 239 N.E.2d 897 (1968) (which "eradicated the distinction between a husband and wife in their respective rights to recover for loss of consortium in a personal injury action") and *Tilley v. Hudson River Railroad Co.,* 24 N.Y. 471 (1862) (allowing children to recover for loss of parental services in wrongful death actions), the court concluded that "[t]he time

has come to recognize the pecuniary value of the society which a husband and wife provide for each other as part of the wife's compensation for the wrongful loss of her husband." 65 A.D.2d at 356, 411 N.Y.S.2d at 279. Certainly as a matter of policy and equity it is nonsensical to allow one spouse to recover loss of consortium when the other is maimed, but not when the other is killed.

The three arguments that have been made against construing "pecuniary injuries" to encompass loss of consortium are untenable. The first, that the loss of a spouse's "love, companionship, affection, society, sexual relations, solace, and more," the elements of consortium, *Millington, supra,* 22 N.Y.2d at 502, 293 N.Y.S.2d at 308, 239 N.E.2d 899, cannot be valued in monetary terms, has been forcefully rejected by the Court of Appeals, *id.* at 507, 293 N.Y. S.2d at 312, 239 N.E.2d at 902. The second, that legislative action is required to "amend" the wrongful death statute to authorize recovery for the loss of consortium (an argument that the Second Department has invoked in a series of summary decisions, *e. g. Rowe v. Home,* App.Div., 421 N.Y.S.2d 21 (2d Dept.1979); *Liff v. Schildkrout,* 67 A.D.2d 999, 413 N.Y.S.2d 625 (2d Dept.1979); *but cf. Martins v. Ford,* 53 A.D.2d 887, 385 N.Y.S.2d 620 (2d Dept. 1976), *discussed in Grant v. Guidotti,* 66 A.D.2d 545, 559 n. 10, 414 N.Y.S.2d 171, 180 n. 10 (2d Dept.1979)), ignores the fact that it is the prerogative and duty of the New York courts to construe the statute enacted by the legislature, which presumably did not consider the precise question involved here simply because at the time the statute was enacted its principal intended beneficiaries, the widows of men killed in industrial accidents, were not believed entitled to recovery for loss of consortium in any circumstances. Similarly, the third argument, that the legislature's failure to amend the statute indicates that it should not be construed to allow recovery for loss of consorti-

---

8. *Ventura* and two other cases cited in this section, *Grant v. Guidotti,* 66 A.D.2d 545, 414 N.Y.S.2d 171 (2d Dept.1979), and *Liff v. Schildkrout,* 67 A.D.2d 999, 413 N.Y.S.2d 625

(2d Dept.1979), are currently on appeal before the New York Court of Appeals. *See* N.Y.L.J., January 14, 1980 (Vol. 183, No. 9) at 16, col. 1.

um, is fallacious because the legislature (to the extent that it has considered the question at all) may well have assumed (as others have) that in view of the Court of Appeals' decisions over the last ten years, such an amendment is not necessary.

Village Towers asserts that *Ventura* was wrongly decided, and relies on *Osborn v. Kelley*, 61 A.D.2d 367, 402 N.Y.S.2d 463 (3d Dept.1978), the only other recent appellate decision that gives more than passing attention to the issue. In *Osborn*, which was decided before *Ventura*, the Third Department held that loss of consortium is not compensable in wrongful death actions. The court's reasoning, however, is not clear. Review of the New York cases persuades us that Ms. Robinson was properly allowed to seek recovery for loss of consortium.[9]

## V.

■ Relying on two cases, *Dullard v. Berkeley Associates Co.*, 606 F.2d 890 (2d Cir. 1979), and *Zaninovich v. American Airlines, Inc.*, 26 A.D.2d 155, 271 N.Y.S.2d 866 (1st Dept.1966), Village Towers argues that the jury's awards for pecuniary loss ($750,-000.) and loss of consortium ($400,000.) were excessive. We cannot agree.

With respect to pecuniary damages (the loss to Robinson's family of the value of his support and services), the jury had the benefit of detailed and impressive testimony by Conrad Berenson, a labor economist called by the plaintiff.[10] The defendants did not call an expert witness, nor did they (nor does Village Towers now) challenge the accuracy of the data on which Berenson relied during his testimony.

Without rehearsing Berenson's testimony in detail, it is sufficient to note that his calculations took account of Robinson's age and work experience, his wages, overtime income, and fringe benefits, and the dollar value to the other members of his family of the household contributions of an average individual in his circumstances. In addition, those calculations included a deduction representing the costs that Robinson would have incurred had he lived. Finally, Berenson estimated, based on a review of Robinson's earnings record and union contract, that his earnings would have increased at an average annual rate of 5.5%. Berenson computed gross pecuniary loss accordingly. He then discounted his estimate of the gross loss at a rate of 7%. He testified that although this rate underestimated the current market, it was a good long-range figure. Moreover, he noted that if interest rates were to continue at their current high levels as a result of continued high inflation, Robinson's wages would have increased at a rate concomitantly higher than that of 5.5% used in the calculations.

Berenson estimated a discounted gross loss of $485,139. He testified that if this sum were invested, it would pay the family, during the expected lifetime of Robinson and his wife, the monetary value of Robinson's earnings and services to them, and be exhausted at the end of that time.

Berenson's estimate did not take into account at least three factors that the jury was entitled to consider in reaching its verdict, factors that no doubt explain the difference between Berenson's estimate of approximately $500,000. and the jury's award of $750,000. First, Berenson's estimate did not take account of the possibility that the decedent might be promoted, and his wages increased. In this regard, the evidence established that the decedent was an extraordinarily productive man, accomplished in his trade, and very likely to prosper and improve his prospects. Second, with respect

---

**9.** Under New York Law a decedent's spouse may pursue a cause of action for loss of consortium in his or her own name with respect to the loss suffered prior to the decedent's death, but although "the interest sought to be protected is personal to the [spouse]," *Millington v. Southeastern Elevator Co.*, 22 N.Y.2d 498, 503, 293 N.Y.S.2d 305, 308, 239 N.E.2d 897, 899 (1968), with respect to loss of consortium suffered *after* the decedent's death, the action must be brought by the decedent's personal representative, acting on behalf of the spouse. N.Y. Est., Powers & Trust Law § 5–4.1. Here Ms. Robinson sues on her own behalf and as the personal representative of her former husband.

**10.** See Trial Transcript at 434–87.

to the value of the decedent's household services, Berenson's estimate was based on government statistics for "average" individuals. The evidence established that the decedent's services around the home were far more substantial than those of the "average" individual. Finally, Berenson's estimate did not include any amount reflecting the intellectual, moral, and physical training, guidance and assistance that the decedent would have provided his children had he lived. The evidence established that the decedent was devoted father who spent a great deal of time with his children and was very concerned with their welfare. In view of these considerations, the jury's award of an amount fifty percent greater than Berenson's conservative economic estimate was reasonable.

The two cases on which Village Towers relies, far from supporting its contention that the award here was excessive, in fact suggest that it was well within bounds. In *Zaninovich*, the court ordered a new trial unless the plaintiff agreed to the reduction of the jury's award from $550,000. to $350,000. Village Towers' direct comparison of the facts and award in *Zaninovich* with those here is inapt: even if the facts proven there were similar to those involved here, the jury's award in *Zaninovich* of $550,000. in 1966, was the equivalent of an award of $1,248,500. in November, 1979; the reduced award of $350,000., which the court determined to be reasonable in the circumstances of that case, was the equivalent of $794,500. in November, 1979.[11]

More to the point, the determination in *Zaninovich* that the jury's award there was excessive was based on several considerations that do not apply here. First, the court there noted that any award for loss of future earnings must be discounted. Here Berenson discussed discounting at length;

in addition the jury presumably took as the starting point for its discussion his *discounted* estimate. Second, the *Zaninovich* court noted that any award must be reduced by an amount equivalent to "the father's own expenditures for himself." 26 A.D.2d at 160, 271 N.Y.S.2d at 872. Again, plaintiff's expert discussed this, and provided an estimate of what those expenditures would be. In addition, the jury was instructed to consider only "[t]he portion of [Robinson's] earnings that he would in the future have applied to the care and support of his wife and children. . . ."[12] Third, the decedents in *Zaninovich* were 28 and 29 at their death. As the court noted, "with people as young as these who died here, at the start of their careers, the contingencies for the far future become extremely great and require an all but total discounting of the suggested expectations." *Id.* Here the decedent was 41 when he died, with an established job and household. The bounds within which his life would have proceeded, had he lived, were as well established as any person's can be, in an uncertain world; there is no reason to believe that the jury did not give due consideration to the vagaries of life in making its award. Similarly, the *Zaninovich* court apparently believed that the jury there had engaged in "amateurish speculation as to continuing inflation." *Id.* Here there was expert testimony to the effect that inflation could not be expected to continue at current levels, and that in any event the two predictable effects of inflation—greater wage increases and higher interest rates—would tend to cancel each other.[13] Finally, the decision in *Zaninovich* clearly reflects a concern that the jury was improperly influenced by the fact that the defendant there was a large corporation—"[i]t is difficult to believe that a similar verdict would have been rendered against a smaller enterprise." *Id.* Village

---

11. The annual average consumer price index for the New York metropolitan area in 1966 was 97.5. In November, 1979, it was 221.3. United States Department of Labor, Bureau of Labor Statistics, Historical Table of the Consumer Price Index for All Urban Consumers, New York-Northeastern New Jersey Area

[1967 = 100]. Accordingly, the cost of living in the area increased over that period by a factor of 2.27 $(\frac{221.3}{97.5})$.

12. Trial Transcript at 846.

13. See note 16 *infra*.

Towers has not contended that the jury here was improperly influenced by consideration of the defendants' possible financial resources.

Village Towers' reliance on *Dullard v. Berkeley Associates Co.*, 606 F.2d 890 (2d Cir. 1979), is also misplaced. There the Second Circuit ordered a new trial unless the plaintiff agreed to a reduction of the jury's award from $630,000. to $500,000. The plaintiff had proven lost support of only $15,704. annually,[14] or a total undiscounted loss of $424,008. (given decedent's working life expectancy of twenty-seven years). The court found the evidence relating to the decedent's overtime earnings and future earnings potential insufficient to justify any award in respect of those items, so the difference between the total loss proven, $424,008. and the total award, $630,000., or between the annual loss proven, $15,704., and the annual return on $630,000. (at 7%), $44,100., could only represent compensation for loss of decedent's household services and parental guidance. The court noted:

"With respect to loss of services and guidance, although we recognize that this is not only a legitimate element of damages

in New York but an important one, we do not believe that it justifies more than tripling either the annual income to the survivors or the total award for loss of pecuniary support."

*Id.* at 895. Here, however, the plaintiff established total undiscounted lost wages. (for a twenty-nine year expected working life) of over $600,000., which, when adjusted to take account of the evidence respecting decedent's overtime earnings and fringe benefits becomes nearly $795,000.[15] When compared with this figure, the jury's award of $750,000. can hardly be called unreasonable. Similarly, the evidence here establishes that at the time of his death the decedent's annual earnings (wages, overtime, and fringe benefits) were more than $21,000., which under his union contract would have become $22,450. seven weeks after his death, and $27,900. in May, 1982. The annual return on $750,000. (at 7%), $52,500., is less than double the latter figure. Moreover, the award here reflects the probability that the decedent would have improved his position with his employer, something which the award in *Dullard* could not do, due to the plaintiff's lack of proof on this issue.[16]

---

14. Although New York law apparently does not require that a wrongful death recovery be reduced by the amount of a decedent's expected tax liability, the plaintiff in *Dullard* introduced evidence of decedent's take-home pay only, not his gross income, and the Second Circuit deemed it inappropriate to inflate the figure of $15,704. on the basis of "total speculation" about the decedent's tax liability. 606 F.2d at 895 n. 5. The principal lesson of *Dullard* is that one cannot recover damages that one has not proven.

15. Robinson's hourly wage at the time of his death was $7.75, and Berenson testified that under subsequently executed union contracts it would have increased periodically to $10.25 in May, 1982. Assuming annual half-dollar increments each May 15th, Robinson's lost earnings through January 9, 2007, can be computed as follows:

| | | |
|---|---|---|
| Jan. 9, 1978 – May 15, 1978 | ($ 7.75/hr.): | $ 2,914.00 |
| May 15, 1978 – May 15, 1979 | ($ 8.25/hr.): | 17,160.00 |
| May 15, 1979 – May 15, 1980 | ($ 8.75/hr.): | 18,200.00 |
| May 15, 1980 – May 15, 1981 | ($ 9.25/hr.): | 19,240.00 |
| May 15, 1981 – May 15, 1982 | ($ 9.75/hr.): | 20,280.00 |
| May 15, 1982 – Jan. 9, 2007 | ($10.25/hr.): | 529,146.00 |
| | | $606,940.00 |

If this sum is increased by the factors used by plaintiff's experts to determine Robinson's expected overtime earnings (18.5% of gross pay, or $112,283.90) and fringe benefits (12.4% of gross pay, or $75,260.56) it becomes $794,484.46. Of course, for the reasons stated in the text, this is not a good estimate of the actual loss of support suffered by Ms. Robinson and her children; it is, however, the equivalent of the $424,008. figure used for comparative purposes in *Dullard.*

16. One other aspect of the *Dullard* decision merits attention. In discussing whether a wrongful death award may be adjusted to take cognizance of the possible effects of future inflation, the court reiterated its somewhat tepid endorsement of the use of an "inflation adjusted discount rate" of 1.5%. *Compare Dullard v. Berkeley Associates Co.*, 606 F.2d 890, 896 (2d Cir. 1979) *with Feldman v. Allegheny Airlines, Inc.*, 524 F.2d 384, 387–88 (2d Cir. 1975). Here plaintiff's expert made no allowance for inflation except to assume that Robinson's wages would continue to rise at an annual rate of 5.5% after 1982. He applied a discount factor of 7%. The result was the same as if no allowance were made for possible future wage increases, and a

Village Towers' contention that the jury's award of $400,000. for loss of consortium was excessive is based on what it calls "the inherent duplication between pecuniary damages for wrongful death and loss of consortium.[17] To the extent that Village Towers intends to argue that such duplication is in fact "inherent," its argument must be rejected because the elements of "pecuniary damages" and the elements of consortium, described elsewhere in this opinion, are distinct. To the extent that Village Towers means to argue that the jury here was confused as to the elements of each and consequently made a duplicative award, it has identified no source for such confusion. It does not, for instance, argue that the court's charge was confusing.[18] In fact, the single incident which Village Towers points to as evidence of the jury's supposed confusion—its question whether loss of parental guidance is an element of "pecuniary damages" or loss of consortium [19]—is as much an indication that the jury scrupulously observed the distinction between the two as it is that the jury confused it.

Although the award for loss of consortium was a large one, there is no basis for concluding that it was excessive.

Village Towers' final argument regarding the impropriety of the jury's award is that the jury was influenced by plaintiff's counsel's statements in summation regarding punitive damages. At that time, counsel for all the parties and the court were under the impression that punitive damages could be recovered in this action. It was only on the next trial day that counsel for Village Towers suggested that punitive damages could not be recovered. At that time plaintiff's counsel, after consulting with his client, withdrew the claim for punitive damages, and the court instructed the jury

to disregard all references to punitive damages.

It is of course impossible to know what role plaintiff's counsel's allegedly "inflammatory" remarks may have played in the jury's deliberations. However, since the jury's award is reasonable, it would be irresponsible in these circumstances to order a new trial solely on the basis that the jury was improperly influenced by those remarks.

## VI.

■ Village Towers argues that it was error to charge section 78 of the Multiple Dwelling Law, which provides, in part:

"Every multiple dwelling, including its roof or roofs, . . . shall be kept in good repair. The owner shall be responsible for compliance with the provisions of this section . . . ."

N.Y.Mult. Dwell. Law § 78. Village Towers argues that this section was inapplicable to the roof of the garage at 15 Charles Street because "the provisions of the Multiple Dwelling Law apply only to the portion of a building used for residential as opposed to commercial purposes."[20] This appears, however, to overstate the law—the Multiple Dwelling Law apparently applies to all portions of a multiple dwelling except those used exclusively for purposes other than residence. *Compare Creston Burnside Holding Corp. v. Ken-Ross Associates, Inc.,* 47 Misc.2d 759, 263 N.Y.S.2d 224 (Civ.Ct. N.Y., Bronx Co., 1965) *with Sticker v. Seril Realty Corp.,* 256 N.Y. 687, 177 N.E. 194 (1931). The garage here was apparently used only by the tenants of 15 Charles Street. In any event, it is highly unlikely that the jury was much affected by the charge respecting section 78, nor does Village Towers suggest how this charge would have been likely to influence the finding of

---

discount factor of 1.42% ($\frac{1.07}{1.055}$) were used. *See Feldman, supra,* 524 F.2d at 390–91 (Friendly, J., concurring dubitante.)

17. Defendant, Village Towers Company, Memorandum of Law at 25.

18. With respect to damages, the charge followed closely the standard pattern jury instructions. *Compare* Trial Transcript at 845–49 *and* 850–51 *with* N.Y. PJI 2:320 *and* 2:315 (2d ed. 1974).

19. See Trial Transcript at 866–67.

20. Defendant, Village Towers Company, Memorandum of Law at 29.

a juror who was already charged as to Village Towers' obligations under sections 240 and 241.6 of the Labor Law and the common law of negligence.

Village Towers also contends that it was error not to charge respecting Robinson's intoxication. However, the charge properly and adequately dealt with Village Towers' argument to the jury that Robinson may have taken some Vodka on the day of the accident, and that this may have contributed to his accident.

Finally, Village Towers asserts that it was error not to charge comparative negligence with respect to the defendants' liability under sections 240 and 241.6 of the Labor Law. Whether or not comparative negligence applies with respect to injuries resulting from violations of these provisions, the issue is moot here, since the jury expressly found that Robinson was not negligent on the day in question.

\* \* \* \* \* \*

For the reasons stated, Village Towers' motion for a new trial is denied, and Wasoff's motion for judgment n. o. v. is granted. The jury's finding that negligence on the part of Wasoff was 12% responsible for Joseph Robinson's death is set aside.

It is so ordered.