Hilda HEGGER, Executrix of the Estate
of Fred P. Hegger,
Plaintiff-Appellee-Appellant,

v.

George E. GREEN, Defendant-Appellee,

and

St. Luke's Hospital Center,
Defendant-Appellant-Appellee.

Nos. 12, 49, Dockets 80–7146, 80–7170.

United States Court of Appeals,
Second Circuit.

Argued Oct. 16, 1980.

Decided March 12, 1981.

Rehearing and Rehearing In Banc
Denied May 13, 1981.

Paul D. Rheingold, New York City, for plaintiff-appellant.

Roger P. McTiernan, New York City (Michael F. Close, Barry McTiernan & Moore, New York City, of counsel), for defendant-appellant-appellee St. Luke's Hospital Center.

Sidney A. Florea, New York City (Ferziger, Wohl, Finkelstein & Rothman, New York City, of counsel), for defendant-appellee George E. Green.

Before FRIENDLY, MANSFIELD and MESKILL, Circuit Judges.

MESKILL, Circuit Judge:

The plaintiff Hilda Hegger, executrix for the estate of her deceased husband, Fred Hegger, brought this diversity-based medical malpractice action against the defendants Dr. Green and St. Luke's Hospital Center (St. Luke's), claiming that their negligence caused the wrongful death of her husband. The jury found that both defendants had been negligent and that the decedent had been contributorily negligent. In response to special interrogatories, the jury computed the total damages due the plaintiff, deducted a percentage for the decedent's contributory negligence, and apportioned the net damages between the two defendants. St. Luke's appeals, claiming that certain damages were improperly awarded and that, in any event, there was insufficient evidence to support a finding of negligence against it. The plaintiff appeals that portion of the judgment imposing a deduction for the contributory negligence of the decedent. Dr. Green did not appeal. For the reasons stated below, we reverse the judgment against St. Luke's, reverse the deduction for contributory negligence, and modify the remaining judgment to align it with New York precedents governing the recoverability of loss of consortium in wrongful death actions.

## BACKGROUND

Fred Hegger, a 52-year-old plant manager of a cloth finishing company, collapsed on the job on October 6, 1976, and was rushed to Hackensack Hospital in New Jersey. There, various test results[1] showed that two major coronary arteries were seriously occluded. On the basis of these tests, Dr. Goodman, Hegger's attending cardiologist at Hackensack, concluded that Hegger should undergo coronary bypass surgery. Therefore, after a consultation with the patient, one of the Hackensack doctors contacted Dr. George Green, a well-known cardiac surgeon, to inquire whether he would accept Hegger as a candidate for cardiac surgery. After taking Hegger's history over the telephone, Dr. Green agreed, and arrangements were made for the transfer of the patient to St. Luke's Hospital Center, where Dr. Green performed nearly all of his surgery.

During his hospitalization at Hackensack, Hegger's activities were quite restricted and his condition closely watched. For the first five days, he stayed in the coronary care unit (CCU), where he was confined to bed and attached to monitoring equipment. When his condition seemed to stablize, he was transferred to the regular floor, but had to return to the CCU the following day when he developed severe chest pain and an

1. The tests included electrocardiograms, blood serum tests, and a coronary arteriogram. The arteriogram revealed that a branch of the left coronary artery was 80% obstructed and that the right coronary artery was 40–50% blocked.

extremely low heartrate.[2] About a week later, on the 21st, he was again transferred to the regular floor, but electronic monitoring continued[3] and his activities remained restricted. Throughout his stay at Hackensack he was explicitly forbidden to smoke.

On Friday, October 29th, Hegger was transferred by ambulance to St. Luke's. The evidence was conflicting as to when surgery was first scheduled. The plaintiff claims that surgery was planned for November 1st, but was inexplicably and unjustifiably postponed. Dr. Green claimed that the first surgery date was November 10th. In any event, the surgery was not performed and Hegger died of heart failure in the early morning hours of November 4th.

During his stay at St. Luke's, Hegger was allowed more freedom and was subjected to less scrutiny than he received at Hackensack Hospital. He was neither placed in a CCU nor attached to any monitoring equipment. He was allowed to walk around, and would meet with his family in the solarium on his floor. On one occasion, he walked up, and later down, a flight of stairs leading to the solarium on the floor above his. Finally, there were no written orders in Hegger's chart prohibiting smoking, although Dr. Green testified that he had "standing orders" to this effect for all his surgery patients. Nevertheless, the evidence showed that Hegger smoked at least three cigarettes while he was at St. Luke's.

The plaintiff's case against Dr. Green proceeded on two theories. First, she claimed that her husband needed surgery at once and that Dr. Green's failure promptly to operate was malpractice. Second, she asserted that Dr. Green negligently failed to take proper steps regarding the observation and supervision of her husband, arguing that the doctor should have ordered electronic monitoring for her husband and should have entered specific orders restricting his activities and forbidding his smoking.[4]

The case against St. Luke's was based on the hospital's failure to prevent the patient from roaming about, failure to carry out Dr. Green's "standing orders" prohibiting smoking, and failure to maintain adequate nursing observation. The plaintiff presented evidence that Hegger had smoked regularly at St. Luke's, and that on one occasion a hospital attendant had handed him an ashtray. Further, although no specific orders had been written, the plaintiff elicited testimony from Dr. Green that it was not customary for cardiac patients to leave the floor. Finally, the plaintiff produced evidence that Hegger was not attended between 1:00 a. m. and 6:30 a. m. on November 4th, when he was found dead in bed. At the close of all the evidence, the plaintiff moved for a directed verdict removing the issue of contributory negligence from the jury, and both defendants moved for directed verdicts on the issue of liability, claiming no causation had been shown. The court denied these motions.

In response to special interrogatories, the jury found both defendants liable and awarded the plaintiff a total of $526,984. That award comprised $501,984 on the wrongful death claim (including $25,000 for loss of consortium and $25,000 for loss of parental services) and $25,000 on plaintiff's survival claim for the decedent's pain and suffering. From the total award, the jury deducted 27 percent for the contributory negligence of the decedent. The jury apportioned the remaining damages ($384,698) according to relative fault, finding Dr. Green 25 percent responsible and St. Luke's 75 percent responsible. Judge Motley, while confessing some surprise over the ap-

---

2. During this incident, Hegger's heart apparently stopped at one point, necessitating electrical cardioversion to restart the heartbeat.

3. Electronic monitoring outside the CCU is possible by means of "telemetry"—an arrangement whereby the patient is attached to "a little box" which allows him freedom of movement while simultaneously providing the nursing station with constant surveillance of his heart rhythm.

4. The evidence was undisputed that Dr. Green, as the physician in charge of the patient, was solely responsible for placing the patient in a CCU or ordering monitoring.

portionment, refused to grant either the plaintiff or the defendants a judgment notwithstanding the verdict, ruling that the jury's finding was not unreasonable as a matter of law. Judgment was entered and both the plaintiff and St. Luke's appeal.

## DISCUSSION

### A. The Hospital's Appeal

#### 1. Damages

■ The hospital argues that the award of $25,000 for loss of consortium must be reversed in light of the intervening decision of the New York Court of Appeals in *Liff v. Schildkrout*, 49 N.Y.2d 622, 427 N.Y.S.2d 746, 404 N.E.2d 1288 (1980). We agree. At the time this case was tried, New York law was unsettled as to whether damages for loss of consortium could be recovered in a wrongful death action. *Compare Ventura v. Consolidated Edison Co.*, 65 A.D.2d 352, 411 N.Y.S.2d 277 (1st Dep't 1978), *rev'd*, 49 N.Y.2d 622, 427 N.Y.S.2d 746, 404 N.E.2d 1288 (1980) (allowing recovery) *with Grant v. Guidotti*, 66 A.D.2d 545, 555 n.10, 414 N.Y.S.2d 171 (2d Dep't 1979), *aff'd*, 49 N.Y.2d 622, 427 N.Y.S.2d 746, 404 N.E.2d 1288 (1980) *and Osborn v. Kelley*, 61 A.D.2d 367, 402 N.Y.S.2d 463 (3d Dep't 1978) (forbidding recovery). The Court of Appeals has since settled the matter in *Liff, supra,* in an emphatic opinion which underscored the prerogative of the legislature to control the content of the statutorily created wrongful death action. The court held that the statute does not contemplate recovery for loss of consortium and that the "very existence of the statutory right" precludes the possibility of a separate common law cause of action for that loss. *Liff v. Schildkrout, supra*, 49 N.Y.2d at 632, 427 N.Y.S.2d 746, 404 N.E.2d 1288.

■ It is well settled that on direct review an appellate court must apply the law in effect at the time it renders its decision, *United States v. Schooner Peggy*, 5 U.S. (1 Cranch) 103, 109–11, 2 L.Ed. 49 (1801); *Thorpe v. Housing Authority of Durham*, 393 U.S. 268, 281–82, 89 S.Ct. 518, 525–526, 21 L.Ed.2d 474 (1969), unless doing so would cause manifest injustice,[5] *Bradley v. School Board of Richmond*, 416 U.S. 696, 716, 94 S.Ct. 2006, 2018, 40 L.Ed.2d 476 (1974). The basis for the rule was first explained by Chief Judge Marshall, and remains the same today:

> It is, in the general, true, that the province of an appellate court is only to inquire whether a judgment, when rendered, was erroneous or not. But if, subsequent to the judgment, and before the decision of the appellate court, a law intervenes and positively changes the rule which governs, the law must be obeyed, or its obligation denied. If the law be constitutional, and of that no doubt, in the present case, has been expressed, I know of no court which can contest its obligation.

*United States v. Schooner Peggy, supra*, 5 U.S. at 110, 2 L.Ed. 49. Since a federal court sitting in diversity must apply the governing state law, *see Erie Railroad Co. v. Tompkins*, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938), we must abide by intervening decisions handed down by New York's highest court. *See Vandenbark v. Owens-Illinois Glass Co.*, 311 U.S. 538, 61 S.Ct. 347, 85 L.Ed. 327 (1941); *Huddleston v. Dwyer*, 322 U.S. 232, 64 S.Ct. 1015, 88 L.Ed. 1246 (1944) (per curiam); 1A J. Moore, Federal Practice ¶ 0.307[3] (2d ed. 1980).[6]

---

**5.** In *Bradley v. School Board of Richmond, supra*, 416 U.S. at 711, 94 S.Ct. at 2016, the Supreme Court held that appellate courts have discretion not to apply an intervening change in *federal* law where to do so would cause "manifest injustice." Even assuming that the "manifest injustice" exception applies with equal force when the federal court is sitting in diversity, *see Baker v. Outboard Marine Corp.*, 595 F.2d 176, 182 n.19 (3d Cir. 1979), there is no indication in this case that retroactive application of *Liff v. Schildkrout, supra*, will result in manifest injustice.

**6.** Although the primary purpose of *Vandenbark* was to avoid "the confusion and injustices arising from inconsistent federal and state interpretations of state law," 311 U.S. at 543, 61 S.Ct. at 350, considerable disagreement has arisen concerning whether *Vandenbark* requires retroactive application of an intervening state court

■ The plaintiff argues, however, that "[e]ven though the Court of Appeals had not resolved the consortium issue, there was sufficient basis to object at that time," and that the hospital's failure to object to the charge bars appellate review. *See* Fed. R.Civ.P. 51. We find this contention to be meritless for several reasons. First, the very purpose of Rule 51 is to alert the trial judge to *errors* in the charge so they can be corrected before the jury retires. *See* 5A J. Moore, Federal Practice ¶ 51.04 at 51–30 through 51–35 (2d ed. 1980). At the time the loss of consortium charge was given, New York authority was divided on whether such damages were recoverable. We feel that the policies supporting the rule are far less compelling under these circumstances. *See General Beverage Sales Co. v. East-Side Winery*, 568 F.2d 1147, 1152 (7th Cir. 1978) (failure to object does not bar appellate review where applicable law had changed in the interim). Moreover, the purposes of *Vandenbark v. Owens-Illinois Glass Co., supra*, would be largely frustrated by a literal application of Rule 51 in these circumstances, since the intervening state decision would be applied "only in those rare cases where counsel had the foresight to predict the change." *General Beverage Sales Co. v. East-Side Winery, supra*, 568 F.2d at 1152. Finally, even accepting the plaintiff's argument that the hospital should have objected to the charge, we would reverse the award on our own initiative under the "plain error" exception to Rule 51, *see Cohen v. Franchard Corporation*, 478 F.2d 115 (2d Cir.), *cert. denied*, 414 U.S. 857, 94 S.Ct. 161, 38 L.Ed.2d 106 (1973), in light of the "demonstrable deviation of

the court's instruction here from the appropriate standard" and the "remediability of this error without a new trial below." *See Williams v. City of New York*, 508 F.2d 356, 362 (2d Cir. 1974) (reversing punitive damage award based on erroneous statement of New York law). We therefore hold that the award for loss of consortium must be set aside.

■ The hospital also claims that the award for conscious pain and suffering must be set aside, inasmuch as there was absolutely no evidence that the decedent suffered any pain before he died. St. Luke's argues that under New York law, a plaintiff must produce some evidence of actual pain, such as gesturing or moaning, to recover damages for pain and suffering; mere speculation is insufficient. *See, e. g., Cook v. Erwin*, 30 A.D.2d 579, 289 N.Y.S.2d 730 (3d Dep't 1968); *Kinner v. Kuroczka*, 12 A.D.2d 383, 212 N.Y.S.2d 479 (3d Dep't 1961). In this case, however, the hospital did not move pursuant to Fed.R.Civ.P. 50(a) for a directed verdict on this issue, nor did it object pursuant to Fed.R.Civ.P. 51 to the court's charge advising the jury that they could award damages for actual pain and suffering. Under these circumstances, where the appellant failed to move for a specific directed verdict, failed to request a peremptory charge, and failed to object to the instruction submitting the issue to the jury, appellate review of the sufficiency of the evidence on that point is inappropriate. *See Rochester Civic Theatre, Inc. v. Ramsay*, 368 F.2d 748, 752 (8th Cir. 1966); *Sanford Bros. Boats, Inc. v. Vidrine*, 412 F.2d

decision when the controlling state law itself provides for prospective application of such decisions. *Compare Downs v. J. M. Huber Corp.*, 580 F.2d 794 (5th Cir. 1978), *and Samuels v. Doctors Hospital Inc.*, 588 F.2d 485 (5th Cir. 1979) (suggesting in alternate holdings that the federal court should determine whether state court would retroactively apply intervening decision) *with Nelson v. Brunswick Corp.*, 503 F.2d 376, 381 n.12 (9th Cir. 1974) (applying, somewhat reluctantly, the "hard-and-fast" *Vandenbark* rule) and *Passwaters v. General Motors Corp.*, 454 F.2d 1270, 1276 (8th Cir. 1972) (literal application of *Vandenbark*). *See generally* 1A J. Moore, Federal Practice

¶ 0.307[3] at 3104–05 (2d ed. 1980). We need not decide this question, however, since under New York law the *Liff* decision would apply retroactively. *See Carmel Associates, Inc. v. Turner Constr. Co.*, 35 A.D.2d 157, 159, 314 N.Y.S.2d 941 (1st Dep't 1970) (applying intervening decision of Court of Appeals which imposed strict liability for blasting). *Cf. Black River Regulating Dist. v. Adirondack League Club*, 307 N.Y. 475, 486–87, 121 N.E.2d 428 (1954) (applying intervening legislative enactment); *Strauss v. University of State of New York*, 2 N.Y.2d 464, 467, 161 N.Y.S.2d 97, 141 N.E.2d 595 (1957) (applying intervening amendment to regulation).

958, 967–68 (5th Cir. 1969); *Lee v. Pennsylvania R. Co.*, 192 F.2d 226, 229 (2d Cir. 1951) ("[T]o preserve such a contention for the consideration of the appellate tribunal, the matter must be specifically called to the attention of the trial judge in order that he may have the opportunity to consider the asserted insufficiency as to one specification and correct it himself, if necessary, by removing it from the jury's consideration.").

After the jury returned a verdict awarding the plaintiff $25,000 for the decedent's pain and suffering, the hospital moved pursuant to Fed.R.Civ.P. 59(e) "to amend the jury award against it of $25,000 for decedent's conscious pain and suffering, or in the alternative, alter its percentage of fault, or, finally, amend the jury award as excessive." Memorandum Opinion and Order at 5. The court ruled that Rule 59(e) was an improper device to set aside a jury verdict based upon evidentiary insufficiency, declined to treat the motion under Rule 50(b), and denied the motion as improper. We agree that Rule 59(e) is an improper basis for a motion such as the hospital's. Moreover, even assuming that St. Luke's could have made a motion for judgment n. o. v., *compare House of Koscot Development Corporation v. American Line Cosmetics, Inc.*, 468 F.2d 64, 67–68 (5th Cir. 1972) (general directed verdict motion insufficient predicate to j. n. o. v. challenging sufficiency of damage evidence) *with Mosley v. Cia. Mar. Adra S.A.*, 362 F.2d 118, 121–22 (2d Cir.), *cert. denied*, 385 U.S. 933, 87 S.Ct. 292, 17 L.Ed.2d 213 (1966) (generalized directed verdict preserves specific issue for j. n. o. v.), we conclude that Judge Motley did not abuse her discretion in declining to treat the motion under Rule 50(b), particularly in light of the hospital's failure to move for a directed verdict or object to the charge on this issue.

### 2. *Liability*

St. Luke's argues that the plaintiff's negligence case against it never should have been submitted to the jury, and that Judge Motley erred in refusing to grant a directed verdict or judgment n. o. v. More specifically, St. Luke's contends that the plaintiff failed to establish negligence on the hospital's part in its supervision and control of the decedent and that even if negligence could be shown, there was no evidence that any of the hospital's acts or omissions caused Hegger's demise. For the reasons stated below, we agree with the hospital's contention and therefore reverse the judgment against it.

The plaintiff's claim based on the hospital's failure to prevent Hegger from smoking or climbing stairs suffers from a number of defects. In the first place, there was insufficient evidence that the hospital's medical or nursing staff knew or should have known of Hegger's alleged transgressions. Mrs. Hegger testified that, while she knew her husband was smoking at St. Luke's, she did not relay this information to his attending physician or the nursing staff. (J.App. 229–30). She did testify that "[s]ome of the attendants" brought her husband an ashtray, but there was no evidence that these "attendants" were medical personnel or that their knowledge should be imputed to the hospital. With respect to Hegger's stair climbing, Mrs. Hegger testified that he did this "[o]nly once" (J.App. 209), and there was no evidence that St. Luke's had either constructive or actual notice of this lapse.

Further, even assuming that St. Luke's was negligent in failing to control its patient, there was no evidence that Hegger's misdeeds proximately caused his death. Under New York law, except where "the common experience and knowledge of a jury of laymen" can "bridge this scientific gap," *DeFalco v. Long Island College Hospital*, 90 Misc.2d 164, 170, 393 N.Y.S.2d 859 (1977), a plaintiff has the burden of producing expert medical testimony showing proximate cause in medical malpractice actions. *Myers v. County of Nassau*, 36 A.D.2d 633, 319 N.Y.S.2d 268 (2d Dep't 1971); *DeFalco, supra*. We think that determining whether a single trip up a flight of stairs or a small amount of cigarette smoking can be the proximate cause of heart failure in a patient suffering from occluded coronary ar-

teries is beyond the ken of the average juror. And although plaintiff's expert produced a great deal of standard-of-care evidence tending to show that Dr. Green should have restricted Hegger's activities and that such activities are counterproductive among cardiac patients, there was no evidence that Hegger's smoking and/or his ambulations caused his death. On the one occasion plaintiff's counsel came close to asking his expert about causation, the answer was distinctly evasive. The sum total of causation evidence concerning Hegger's smoking and stair climbing is contained in the following testimony elicited from plaintiff's expert on direct examination:

Q. In terms of the condition that Mr. Hegger came in for treatment for at St. Luke's Hospital, what type of risk, if any, was presented for the eventual development of myocardial infarction by his being out of bed, walking stairs, smoking?

A. Well, the risk of sudden death is always present in somebody with unstable angina. That's what we're always concerned about.

▅ The plaintiff's case based upon the hospital's assertedly negligent nursing care likewise must fail. Under New York law, a plaintiff in a medical malpractice action must produce medical testimony to establish the proper standard of care. *Tobias v. Manhattan Eye and Ear Hospital*, 28 A.D.2d 972, 283 N.Y.S.2d 398 (1st Dep't 1967), *aff'd*, 23 N.Y.2d 724, 296 N.Y.S.2d 368, 244 N.E.2d 59 (1968). In this case, no standard of care was established concerning the frequency of nursing visits. Thus, that Hegger was not seen by a nurse from 1:00 a. m. until 6:30 a. m. was not shown to be a deviation from acceptable medical practice and, absent medical testimony, the jury could not permissibly infer negligence from this fact. Moreover, there was no evidence

that more frequent attendance would have saved Hegger. Indeed, most of the expert testimony in this regard revealed that a heart attack victim needs instantaneous care and that the only effective way to ensure prompt detection of a heart attack is to electronically monitor the patient—a procedure which only Dr. Green could order.[7]

### B. *The Plaintiff's Appeal*

▅ The plaintiff appeals from the refusal of the court to grant a directed verdict or a judgment n.o.v. in her favor on the issue of the decedent's comparative fault, claiming that there was no evidence of negligence or causation. The jury's deduction of 27 percent from the plaintiff's recovery was based on the supposedly crucial role that the decedent's smoking and stair climbing played in his eventual death. Inasmuch as we have held that those activities were not shown to have proximately caused Hegger's death, the deduction for comparative fault must be set aside.

### C. *Disposition of the Case*

▅ We are left with the difficult question of how our determination affects the outstanding judgment against Dr. Green. It could be argued that in light of our disposition of the claim against St. Luke's, we cannot be sure that the jury's determination of Dr. Green's liability was based on a proper ground, namely, his failure promptly to operate or to order electronic monitoring, or instead was based upon the doctor's failure to prevent the patient from smoking or climbing stairs. Dr. Green might argue that, to the extent that liability is premised on the latter basis, a new trial is required for him because of our determination that those activities were not shown to have proximately caused Hegger's death. But it is not for us to raise those doubts when Dr. Green has not done so.

---

**7.** In attempting to prove her case against Dr. Green, the plaintiff elicited substantial testimony that electronic monitoring was essential for Hegger and that, had he been so monitored, he would not have died. On appeal, the plaintiff attempts to reap the benefit of this testimony by expanding the meaning of "monitoring" to include general observation. Based on our review of the transcript, we find this argument wholly untenable. With a few exceptions not pertinent to the issues of standard of care or causation, testimony concerning "monitoring" referred to electronic monitoring. *See* testimony of plaintiff's expert at J.App. 51, 88, 89, 90 & 97; testimony of plaintiff's counsel at J.App. 500; testimony of Dr. Green at J.App. 374; and testimony of defendant's expert at J.App. 440 & 441.

Ordinarily, a nonappealing party will not benefit from a reversal or modification of a judgment in favor of an appealing party unless the reversal "wipes out all basis for recovery against a non-appealing, as well as against an appealing, defendant . . .," *In re Barnett,* 124 F.2d 1005, 1009 (2d Cir. 1942); *Kicklighter v. Nails by Jannee, Inc.,* 616 F.2d 734, 742–45 (5th Cir. 1980); *Statella v. Robert Chuckrow Construction Co.,* 28 A.D.2d 669, 670, 281 N.Y.S.2d 215 (1st Dep't 1967);[8] or unless failure to reverse with respect to the nonappealing party will frustrate the execution of the judgment in favor of the successful appellant, *In re Barnett, supra,* 124 F.2d at 1008–12. *See* 9 J. Moore, Federal Practice ¶ 204.11[4]–[5] (2d ed. 1980).[9]

■ It is clear that our holding with respect to the liability of St. Luke's leaves adequate bases upon which the jury could have reasonably found that Dr. Green was negligent. Further, the judgment in favor of St. Luke's does not "wipe out" the basis for the amount of compensatory damages awarded for wrongful death. The compensatory wrongful death damages involved in this case were awarded to provide "fair and just compensation for the pecuniary injuries resulting from the decedent's death to the persons for whose benefit the action is brought." N.Y.E.P.T.L. 5–4.3 (McKinney 1980). *See Franchell v. Sims,* 73 A.D.2d 1, 424 N.Y.S.2d 959 (4th Dep't 1980). Unlike *Statella v. Robert Chuckrow Construction Co., supra,* there is neither a challenge nor a finding that the jury verdicts in this case were "grossly excessive." Finally, the unique situation presented in *Barnett, supra,* bears no similarity to the facts here.[10]

Whether Dr. Green may reap the benefit of our ruling concerning loss of consortium stands in a different light. In this case, the entire basis for an award of loss of consortium has been removed by our holding that the decision of the New York Court of Appeals in *Liff, supra,* applies in this appeal, a holding which effectively "wipes out" the plaintiff's basis of recovery on this point.

### CONCLUSION

The judgment holding St. Luke's liable for negligence is reversed. That portion of

---

**8.** We have uncovered no cases indicating whether, in determining whether to grant Dr. Green a new trial, we should apply state or federal law. In analogous areas, the question has been a source of difficulty for federal courts. *Compare Galard v. Johnson,* 504 F.2d 1198, 1200 n.1 (7th Cir. 1974) *and Nodak Oil Co. v. Mobil Oil Corp.,* 533 F.2d 401, 410 (8th Cir. 1976) (in diversity case, issue whether a new trial should be granted based on excessiveness of damages is matter of federal law) *with Index Fund v. Insurance Co. of North America,* 580 F.2d 1158, 1163 (2d Cir. 1978), *cert. denied,* 440 U.S. 912, 99 S.Ct. 1226, 59 L.Ed.2d 461 (1979) (same issue left undecided) *and Mehra v. Bentz,* 529 F.2d 1137, 1139 n.2a (2d Cir. 1975), *cert. denied,* 426 U.S. 922, 96 S.Ct. 2628, 49 L.Ed.2d 375 (1976) (assuming without deciding that state law governs appellate review of trial judge's granting of j.n.o.v. on the basis of evidentiary insufficiency). We need not decide the issue, however, since the New York and federal standards are substantially identical. *Compare In re Barnett, supra, with Statella v. Robert Chuckrow Constr. Co.,* 28 A.D.2d 669, 670, 281 N.Y.S.2d 215 (1st Dep't 1967).

**9.** The quotation from Professor Moore's treatise in the dissent, p. 33, is from a section dealing with exceptional cases, of which this is not one. As to a case like this the treatise states, ¶ 204.11[4] at 4–55, that "if codefendants are held liable below, and one appeals and one does not, the party appealing does not stand as surrogate for the one who does not, and though the judgment be reversed, the party not appealing remains liable, despite the fact that the liability of each depends upon the same legal principles."

**10.** The dissent would cast Dr. Green as the victim of an "unconscionably harsh" result unless we reverse the judgment despite his failure to appeal. We cannot agree. Clearly Dr. Green (or his insurer) was well satisfied with the verdict, which placed the larger share of the blame on the hospital and Hegger, and wanted it to remain intact. His decision not to appeal was a calculated gamble weighing the risk of reversal as to the hospital against the likely outcome of a retrial with Dr. Green as the sole defendant. We see nothing "substantially unjust" in leaving Dr. Green with the results of a choice which, in light of subsequent events, proved to be a poor one. Moreover, the dissent fails to consider the interest of the plaintiff who has obtained a verdict against Dr. Green on sustainable theories of negligence and should not be required to undergo a retrial in the absence of an appeal by Dr. Green urging that improper theories were also submitted.

the judgment holding the decedent liable for contributory negligence is reversed and the judgment modified to eliminate the reduction therefor. Judgment against Dr. Green is modified to eliminate the recovery based on loss of consortium, leaving Dr. Green liable to the plaintiff for $501,984. St. Luke's may recover its costs against plaintiff. No costs between plaintiff and Dr. Green.

MANSFIELD, Circuit Judge (concurring in part and dissenting in part):

I concur in the majority's holding that the plaintiff failed to establish (1) negligence on the part of Dr. Green and St. Luke's in failing properly to supervise Hegger's activities in the hospital by preventing him from smoking or climbing stairs and in failing to maintain adequate nursing observation, or (2) that the alleged negligence was the proximate cause of Hegger's death. I also agree that the award of $25,000 for loss of consortium must be reversed in the light of *Liff v. Schildkrout*, 49 N.Y.2d 622, 427 N.Y.S.2d 746, 404 N.E.2d 1288 (1980), and that the defendants' contributory negligence claim must fail for the reasons stated by the majority. However, I believe that the majority's decision to award against Dr. Green the full amount of the judgment, $501,984 (after deduction of the $25,000 award for loss of consortium) is a denial of substantial justice and an abuse of discretion, amounting to the assumption by this court of the role of trier of the fact and substitution of its views for those of the jury.

In my view the majority's error lies in its assumption that the jury's finding of liability against Dr. Green was based on claims other than those found by us to have been unsustained. If the jury had based its verdict against Dr. Green on the claims that he failed to place Hegger under electronic monitoring and failed to operate promptly, I would have no quarrel with the result reached by my brothers, even though the jury's apportionment of 75% of the award against the hospital and 25% against Dr. Green raises a serious doubt as to whether,

if the jury had been precluded from finding the hospital liable, it would have awarded such a substantial amount against Dr. Green.

For present purposes, however, the important point is that the jury based its verdict on impermissible considerations, namely, that Hegger died because of failure on the part of Dr. Green to take more steps to insure that Hegger would not smoke or walk upstairs. By finding the hospital 75% negligent, Dr. Green 25% negligent, and Hegger 27% contributorily negligent, the jury appears in all probability to have rejected plaintiff's claim that Hegger died because of Dr. Green's failure to place him on electronic monitoring and to have based its verdict on the claims based on his smoking and walking upstairs. If the jury had based its award against Dr. Green on claims based on lack of electronic monitoring or delay in operating it would not have decreased its award against Green by 27%, since Hegger could not possibly have been contributorily negligent with respect to these claims. Moreover, as to these claims it could not properly have apportioned liability as between Dr. Green and the hospital, since these claims were not (and could not properly be) asserted against the hospital. Under the circumstances, the proper and equitable course is to reverse the judgment against Dr. Green and remand the case against him for a new trial limited to the claims that he failed to operate promptly and to place Hegger under electronic monitoring.

The majority's decision to increase the verdict against Dr. Green from $125,496 (before deducting 27% for Hegger's contributory negligence) to $501,984 (after deducting the $25,000 improperly awarded for loss of consortium) is not mandated by the authorities relied upon by it. The common law rule, which treated a judgment against joint tortfeasors as an entirety that must be affirmed or reversed as to all parties, *Sheldon v. Quinlen*, 5 Hill (N.Y.) 441 (1843); *Bamberg v. International R. Co.*, 121 App. Div. 1, 105 N.Y.S. 621 (1907); Annotation, *Grant of New Trial, or Reversal of Judgment on Appeal as to One Joint Tort-feasor,*

143 A.L.R. 7, 8–9 (1943), including non-appealing defendants, Comment, *Judgments Against Joint Tortfeasors—Problems Arising on Appeal by Only One Defendant*, 31 Mo.L.Rev. 141, 142 (1962), would mandate reversal of the judgment against Dr. Green. Although that rule has been modified to the extent of permitting an appellate court to affirm as to a defendant properly held liable despite a reversal as to a co-defendant, *Chiarello Bros. Co. v. Pederson*, 242 F. 482, 484 (2d Cir. 1917), see also *Dollar S.S. Lines v. Merz*, 68 F.2d 594, 595 (9th Cir. 1934), the court may, where it would be in the interest of "substantial justice," reverse a joint judgment in its entirety. *Washington Gas Light Co. v. Lansden*, 172 U.S. 534, 555, 19 S.Ct. 296, 304, 43 L.Ed. 543 (1899); *Constitution Publishing Co. v. Dale*, 164 F.2d 210, 213 (5th Cir. 1947); 6A J. Moore, Federal Practice Par. 59.06 at 59–88 (2d ed. 1980). For the reasons stated above, a reversal of the judgment against Dr. Green and remand for trial of the validly stated claims against him would clearly be in the interest of substantial justice.

The majority circumvents this eminently equitable course on the ground that Dr. Green did not take a formal appeal. With this holding I must disagree. The fact that a judgment against a non-appealing party will be reversed where the reversal of judgment against a co-defendant "wipes out all basis for recovery" against him does not preclude us from entering such a reversal where it would be in the interest of substantial justice. None of the cases cited by the majority would bar such a reversal. Nor have I found any authority holding that, where reversal of a judgment against an appealing defendant would increase or inequitably affect the liability of a non-appealing party, the court may not in its sound discretion reverse the judgment against the latter. On the contrary, the very decisions relied upon by the majority support a reversal here as to Dr. Green. For instance, in *In re Barnett*, 124 F.2d 1005 (2d Cir. 1942), relied on by Judge Meskill, the court reversed the judgment as to the non-appealing defendant, stating:

"As previously observed, the other parties adversely affected by the lower court's order did not pray an appeal. Had they done so, it is clear, from our opinion, that we would have held the order erroneous as to them. We are clear that we have the power to order a reversal as to them even though they did not appeal, and that we should do so under the circumstances here disclosed.... Hence complete reversal is the only proper way to avoid unnecessary complications and ambiguity." *In re Barnett*, 124 F.2d 1005, 1008–09 (2d Cir. 1942).

In *Kicklighter v. Nails by Jannee, Inc.*, 616 F.2d 734, 742–45 (5th Cir. 1980), a reversal of a judgment against a third-party defendant was held to inure to the benefit of a non-appealing defendant/third-party plaintiff, permitting all parties to participate in a new trial, on the ground that "an appeal by one defendant [may] operate for the benefit of another defendant," citing *In re Barnett, supra*, and *Maryland Casualty Co. v. City of South Norwalk*, 54 F.2d 1032 (4th Cir. 1932). In *Statella v. Robert Chuckrow Construction Co.*, 28 A.D.2d 669, 281 N.Y. S.2d 215 (1st Dept. 1967), the third case relied upon by the majority, a judgment against multiple tortfeasors was reversed as to a non-appealing defendant, the court stating:

"Although the defendant Chuckrow did not appeal from the judgment rendered against it in favor of plaintiff, Chuckrow is here on the appeals concerning the determination of its cross complaints and we conclude that the appeals of the codefendants bringing up for review on the merits the question of excessiveness of the verdicts inure also to the benefit of Chuckrow. The verdicts and judgment, insofar as they fix the amounts of recoveries, are in joint form against the several defendants. They occupy the same position and have a common standing with respect to the quantum of plaintiff's recovery. The common-law rule was that verdict or judgment against several tortfeasors might not be reversed as to some and enforced as to others, and that a new trial might not be granted as to some and

denied as to others. The judgment was regarded as an entirety which must be affirmed or reversed on appeal as to all or as to none. Today it is quite generally held that a judgment against multiple tort-feasors may be reversed as to one such defendant without affecting the judgments as to others. In the application of the modern rule, nevertheless, *courts will not enter such a partial reversal where substantial justice requires a reversal as to all defendants, as where it appears there is a right to contribution or indemnity among the codefendants* (*Rome Cable Corp. v. Tanney*, 21 A.D.2d 342, [250 N.Y.S.2d 304]; *Greenberg v. Stanley*, 30 N.J. 485, 504–505, [153 A.2d 833]; *Ferry v. Settle*, 6 N.J. 262, 265–266, [78 A.2d 264]; 5 Am.Jur.2d, Appeal and Error, §§ 949, 950, 951; CPLR 5522.) Fundamental justice requires, moreover, that judicial discretion be exercised and a new trial ordered as to all defendants unless plaintiff stipulates to reduce the award as to all defendants." *Statella v. Robert Chuckrow Construction Co.*, 28 A.D.2d 669, 670, 281 N.Y.S.2d 215 (1st Dept. 1967) (emphasis supplied).

Professor Moore has noted, "the courts of appeals have treated the position of nonparticipants in an appeal on a case to case basis and have not read Rule 3 to limit the *jurisdiction* to reverse or modify a judgment properly brought before it." 9 Moore's Federal Practice Par. 204.11[5], at 4–61 (emphasis in original). I believe this principle should govern here.

Dr. Green's failure to take an appeal is understandable. Both he and the plaintiff were content with the jury's limitation of Dr. Green's liability to 25%. The plaintiff appealed only the 27% deduction based on the jury's finding of contributory negligence. Dr. Green apparently continues to be willing to abide by the 25% verdict even after disallowance of the 27% erroneously deducted by reason of the plaintiff's alleged contributory negligence. He therefore proceeded on the basis that this would be his maximum exposure. The majority, in reversing the judgment against his co-defendant (the hospital), does not merely leave untouched the scope of his liability but increases it by 75%. Under these circumstances, to hold him liable for the full 100%, which was based on impermissible grounds, strikes me as unconscionably harsh. Under the circumstances we should exercise our discretionary power as a matter of fundamental justice to reverse the judgment as to him and remand the validly stated individual claims against him for a new trial, unaffected by the unsustained claims upon which the jury held him liable.