**Hal KOREK and Charlotte Korek, Plaintiffs-Appellants,**

v.

**UNITED STATES of America, Defendant-Appellee.**

**No. 904, Docket 83–6318.**

United States Court of Appeals, Second Circuit.

Argued March 5, 1984.

Decided May 11, 1984.

---

James A. Kreindler, New York City (Kreindler & Kreindler, Steven S. Phillips, Donald I. Marlin, James P. Kreindler, New York City, of Counsel), for plaintiffs-appellants.

Robert Begleiter, Brooklyn, N.Y., Asst. U.S. Atty., E.D.N.Y. (Raymond J. Dearie, U.S. Atty., E.D.N.Y., Miles M. Tepper, Asst. U.S. Atty., Brooklyn, N.Y., of counsel), for defendant-appellee.

Before FEINBERG, Chief Judge, and MANSFIELD and CARDAMONE, Circuit Judges.

FEINBERG, Chief Judge:

Hal Korek and Charlotte Korek appeal from a judgment of the United States District Court for the Eastern District of New York, Jack B. Weinstein, Ch.J., awarding them damages under the Federal Tort Claims Act, 28 U.S.C. §§ 1346(b) & 2671 et seq., for injuries suffered by Hal Korek (plaintiff) as a result of surgery at a Veterans Administration (VA) hospital in Brooklyn.

This medical malpractice case arises out of two operations on plaintiff by doctors employed at the VA hospital. At the outset of the trial, the government conceded both that the surgery had been performed negligently and that it had rendered plaintiff incontinent. In the complaint, Hal Korek sought damages in the amount of $2,500,000 and his wife, Charlotte Korek, sought $500,000 in damages. This case, together with a consolidated case not involved in this appeal, was tried before Chief Judge Weinstein in July 1983, without a jury. At the end of the evidence relating to appellants, the judge rendered his decision from the bench: He held that plaintiff had not proven that a significant element in the damage claim, plaintiff's impotence, was due to any negligence of the defendant. The judge, however, did award plaintiff: $41,000 for medical costs to date; $7,500 for loss of income; $7,500 for future medical costs; $15,000 for past pain and suffering; and $15,000 for future pain and suffering. Plaintiff's wife was awarded $15,000 for loss of consortium. Appellants' subsequent motion to set aside the verdict and obtain a new trial was denied by the court. This appeal followed. The government originally filed a cross-appeal from that portion of the order that awarded damages to appellants. The cross-appeal was later withdrawn with prejudice.

On appeal, appellants argue that the verdict is so unreasonably low as to "shock the conscience." In particular, they claim that the court's finding that plaintiff's impotence was not due to the government's negligence is not supported by the evidence. They also contend that the court's award of damages for pain and suffering is inadequate, and that they were denied a fair trial.

We agree with appellants that the court's finding that the government's negligence did not cause plaintiff's impotence is clearly erroneous. We therefore reverse and remand for a new trial.

I.

The record before us discloses the following: In early 1978, plaintiff, then 54 years old, entered the VA hospital because of an ulcer. When asked whether he had any other medical problems, plaintiff told the doctor that he had been experiencing urinary problems. At the doctor's suggestion, plaintiff went to the hospital's urological department where he was examined and diagnosed as having prostatism. This condition can be caused by enlargement of the prostate gland; the enlargement exerts pressure on and constricts the urethra and

bladder neck, resulting in urinary difficulty. While the condition is ordinarily not dangerous, it carries with it annoying side-effects including urinary frequency, urgency and pain on urination, and nocturia (the need to void frequently at night), which interfered with plaintiff's sleep.

To correct this condition, the VA doctors recommended that plaintiff undergo a transurethral resection of the prostate. In this operation, a tube, which contains a scope permitting the surgeon to visualize the cutting area and a loop or blade to do the cutting or shaving of the tissue, is inserted into the penis through the urethra, and obstructing tissue is removed.

In March 1978, plaintiff had his first resection, which was initially believed to be a success. However, when the catheter was removed a few days later, plaintiff was unable to void at all. Shortly after the catheter was removed, it was reinserted in order to drain urine from the bladder. Soon thereafter, another attempt was made to remove the catheter, with the same result, and the catheter was reinserted for a second time.

Following additional examination, it was determined that the inability to void was caused by a flap of tissue that the surgeon had failed to cut away in performing the operation. The surgeon explained that he had purposely under-resected because he believed plaintiff to be an especially nervous and anxious patient. In any event, the flap apparently blocked the urinary passage, making it impossible for plaintiff to void. In order to correct this painful condition, the same surgeon performed a second resection on plaintiff eight days after the first one. This time, unfortunately, instead of cutting away too little, the surgeon apparently cut open plaintiff's urinary sphincter. In this condition, urine constantly and involuntarily dripped from plaintiff's urethra during the day and night; plaintiff felt "wet all the time."

In order to stop the uncontrollable voiding, the VA physicians initially placed a clamp externally on plaintiff's penis which, when clamped down, "occlude[d] the urethra and prevent[ed] the urine from running out." However, the clamp caused blisters and had to be discontinued. Application of a special type of catheter also proved too painful and had to be discontinued. As a result, plaintiff resorted to paper-absorbent diapers, which did not stop the flow of urine but merely contained it.

Plaintiff was released from the VA hospital with medication and instructions on perineal exercises. He was totally incontinent with respect to urine. According to his psychologist, as a result of the surgery, plaintiff was suffering from "reactive depressive psychosis." She stated that plaintiff's "judgment and ability to differentiate between reality and his thoughts and feelings had caved in. He was in terrible despair. He went from ranting and raving to crying. There was a great deal of talk of suicide." Plaintiff, characterized as a "meticulously clean" person, lived in constant fear of soiling himself and suffering embarrassment.

In October 1978, plaintiff was referred to a doctor in California who specialized in anti-incontinence devices. This doctor determined that plaintiff was a candidate for surgical implantation of a Scott prosthesis. This device consists of a mechanism resembling an inflatable cuff, which is wrapped around the urethra in order to apply pressure to it, thus preventing urine from seeping out of the body. In order to void, a patient must squeeze a small reservoir bulb implanted in the scrotum which forces fluid into another reservoir; this opens up the urethra and permits voiding for two to three minutes, after which time the fluid returns to the cuff, reapplies the pressure and terminates the voiding.

However, before the prosthesis could be implanted, yet another resection had to be performed on plaintiff to remove excessive scarring around the bladder neck. This was necessary to improve the chances of success in implanting the prosthesis; also, there was a danger that, absent the procedure, plaintiff would again be unable to void. A few weeks after his third resection, plaintiff had a fourth operation so

that the prosthesis could be implanted. This was apparently successful, and plaintiff was discharged from the hospital about a week later.

In 1981, plaintiff began to experience a decreasing stream of urine and again traveled to California. It was determined that there was again a build-up of scar tissue on the bladder neck. This necessitated a fifth operation to increase the size of the bladder neck. Plaintiff's treating surgeon testified that this scarring was a secondary result of the resections performed in 1978.

Though the prosthesis appears to be working, plaintiff testified that he continues to drip urine in using it and, accordingly, continues to wear sanitary napkins inside jockey shorts. While the prosthesis is apparently unobtrusive, the device causes, according to the treating surgeon, some "discomfort" from time to time, including pain when plaintiff sits down. Certain activity, such as lifting or riding a bicycle, is restricted or prohibited. With respect to the future, the Scott prosthesis presently has a failure rate of up to 40%.

Specific evidence was adduced relating to plaintiff's mental condition before, during and after the VA surgery, plaintiff's marital relationship and plaintiff's impotence. Plaintiff had suffered a very severe "reactive depression" following the death of his mother and loss of his job in the summer and fall of 1976. When plaintiff first went to see the psychologist in February 1977, he was severely depressed and was taking a drug (Placidyl) upon which he had become dependent. Plaintiff remained in therapy until October 1977, when he left for California to find a job, against the psychologist's advice. According to the psychologist, while plaintiff was not "finished with depression," he was "functioning and was considerably improved." When the psychologist next saw plaintiff following the surgery at the VA hospital in 1978, he was in a psychotic state. He was unable to function on a day to day basis; he lived in fear of suddenly urinating and "hated himself for it," and he was unable to concentrate and harbored suicidal thoughts. The psychologist stated that plaintiff appeared to be suffering from a great deal of pain (he was characterized as having a low threshold of pain) until after the implantation of the prosthetic device. The psychologist also stated that while plaintiff is fearful that the prosthesis will fail, his mental condition has vastly improved, so that it is better than when he first sought therapy in 1977.

Contrary to the testimony of plaintiff and his wife, there was evidence that their marriage was a difficult one with many loud, violent and angry quarrels. The psychologist testified that the marriage had been particularly difficult when plaintiff and his wife had first married in 1948 (they had apparently obtained some therapy in the early years), but that the marriage became easier with time. Both plaintiff and his wife testified that they had an active and happy sexual life prior to the surgery except for a short period after plaintiff's mother's death. The psychologist speculated that while the marriage was difficult, the couple "made up in bed," a phenomenon she described as very frequent.

On the issue of impotence, both plaintiff and his wife testified that prior to the VA operations, he was able to achieve an erection, consummate acts of lovemaking and experience an orgasm. Both testified that after the surgery at the VA hospital, plaintiff was unable to engage in sexual activity: both testified that he was unable to achieve an erection and plaintiff stated that he still feels like a "eunuch" with the prosthesis implanted in him, the pain and the need to wear diapers; his wife testified that after the surgery, they tried sexual intercourse "but nothing could happen."

With respect to medical testimony, the treating psychologist described plaintiff's "traumatic condition of not being completely continent and being impotent. He feels so emasculated and being castrated, he not only feels it, it is true." She stated that plaintiff's condition, which included his psychotic state and impotence, was "unqualifiedly" the result of the surgery at the VA

hospital. With regard to the other medical evidence, the surgeon at the VA hospital who performed the initial two resections testified that impotence is a known complication of such an operation and that "[I]ncontinence ... for whatever reason would probably contribute to impotence, whether it be organic or psychogenic." He testified that if a resection caused incontinence, and an individual reported a normal and satisfactory sex life before the operation and an inability to achieve an erection or orgasm after the operation, he would regard the operation as the proximate cause of the impotence.

Plaintiff's treating surgeon in California stated that "if a patient were made incontinent and suffered the psychological devastation of an incontinency, then he might well lose his potency for psychological reasons, just because he's wet most of the time." He did note, however, that in his experience, such impotence was rare and was psychogenic in origin. The head of the urological department in the VA hospital stated that impotence is a known complication of the resection performed on plaintiff, and particularly a "phenomenon amongst people that have sexual difficulty prior to the operation, or people who have had some psychiatric disabilities in their past history." He continued that while impotence is an uncommon occurrence in patients who do not have sexual difficulty prior to the operation, it does occur and, for a patient with a psychiatric history, impotence is a "frequent phenomenon." Finally, he testified that the incidence of impotence secondary to such an operation increases where there is post-operative incontinence of a permanent nature.

## II.

■ Under the Federal Tort Claims Act, 28 U.S.C. §§ 1346(b) & 2671 et seq., a finding of fact will not be overturned unless the reviewing court is convinced that the trial court has committed a mistake and that its findings are clearly erroneous. See *Fuchstadt v. United States*, 434 F.2d 367 (2d Cir.1970). As *Fuchstadt* indicates, id.

at 369, questions as to causation are also subject to the clearly erroneous standard. See also *Spector v. Mermelstein*, 485 F.2d 474, 480 (2d Cir.1973); *Minerals & Chemicals Philipp Corp. v. S.S. National Trader*, 445 F.2d 831, 832 (2d Cir.1971) (per curiam) (finding that negligence caused fire reversible only if clearly erroneous or based on insufficient evidence); cf. also *Erie Lackawanna Railway Co. v. Timpany*, 495 F.2d 830, 833 & n. 2 (2d Cir.1974) (finding of negligence or lack of negligence not subject to clearly erroneous standard; causation in fact, however, is subject to rule).

■ Plaintiff argues that the court's finding that defendant's negligence did not cause his impotence was clearly wrong. After noting that defendant had conceded that its negligence caused plaintiff to become incontinent, but had not conceded that plaintiff's impotence was the result of defendant's negligence, the court made the following finding on the issue:

> Based on the evidence the Court has before it, the Court finds that the plaintiff has not shown by a preponderance of the evidence that the present or past impotence of the plaintiff was due to any negligence of the defendant.

> The Court doesn't credit the testimony of the plaintiff's witnesses [with] respect to the generally favorable sexual situation prior to the surgery, which is inconsistent with the other evidence in the case with respect to the plaintiff's general background and actions, and inconsistent with the credibility of the witnesses as observed and evaluated by the Court.

\* \* \* \* \* \*

> Most of his problems were not due and will not be due to the fault of the Veterans Administration but to his own basic problems which were pre-existing at the time of the operations.

Thus, the court apparently assumed that plaintiff is impotent, but found that the impotence was not caused by any negligence of the defendant. We agree with

plaintiff that this finding is not supported by the evidence and is clearly erroneous.

First, there is no significant evidence in the record that plaintiff suffered from psychogenic or physiological impotence prior to the surgery at the VA hospital. The evidence shows that the type of operations plaintiff had in the VA hospital can cause impotence, especially where the operation results in incontinence or where the patient before surgery suffered either from psychological problems or sexual difficulty. In this case, the contributing factor of incontinence is conceded. In addition, there is evidence that plaintiff suffered from psychological problems prior to the operations, and the court implicitly found that plaintiff and his wife had sexual difficulties before the operations. Thus, the other contributing factors are also present. Accordingly, there is ample evidence in the record that plaintiff was rendered impotent by the defendant's negligence, and there is no significant evidence that plaintiff's impotence was preexisting or caused by anything other than defendant's conceded negligence. Nor is there any evidence that plaintiff was not impotent after the VA surgery and is not impotent today.

In finding that the present or past impotence of plaintiff was not due to any negligence of the defendant, the district court apparently equated a lack of a "generally favorable sexual situation prior to the surgery" with the sexual dysfunction of impotence. The latter, however, is defined as "[i]nability of the male to attain or sustain an erection satisfactory for normal coitus." The Merck Manual 1770 (13th ed. 1977). This error may have been engendered by the closing arguments, which focused on plaintiff's preexisting psychological difficulties and the state of his marriage. But the government did not argue, and there was no significant evidence, that plaintiff was impotent prior to the surgery at the VA hospital. Accordingly, on this record, the finding that plaintiff's impotence was

not caused by defendant's negligence simply cannot stand.

The government argues that under New York law, ordinarily the failure to call a medical expert to testify that, within a degree of medical certainty, plaintiff was rendered impotent by defendant's negligent act mandates a finding for defendant. See *Monahan v. Weichert*, 82 A.D.2d 102, 442 N.Y.S.2d 295, 298 (4th Dep't 1981); see also *Hegger v. Green*, 646 F.2d 22, 28–29 (2d Cir.1981). But we believe that, at a minimum, the testimony of the psychologist provided the requisite expert testimony; as noted above, she stated in no uncertain terms that plaintiff's condition, which included impotence, was caused by the VA surgery. Defendant argues to us that there was no evidence that the psychologist was an expert on impotence, incontinence or the operations performed on plaintiff. However, impotence can have a psychogenic, as well as an organic basis, and defendant did not question the psychologist's expertise at trial or object to receiving her opinion. Accordingly, the verdict of the district judge, as the trier of fact, erroneously excluded a key element of damages. Under the circumstances, a new trial on the issue of damages is required.[1]

### III.

■ Appellants contend that the damages awarded them are inadequate as a matter of law. Of course, if on retrial, the court finds that the malpractice of the VA doctors caused plaintiff's impotence, the damages awarded to plaintiff should be increased accordingly. On that basis, the damages awarded plaintiff's wife may also be increased for loss of consortium to reflect loss of sexual relations, see *Millington v. Southeastern Elevator Co.*, 22 N.Y.2d 498, 293 N.Y.S.2d 305, 308, 239 N.E.2d 897 (N.Y.1968), although there would still be room for argument on both issues that the lack of a "generally favor-

---

1. Of course, we do not preclude the government from attempting to show on retrial that plaintiff's preexisting medical and psychological problems, which are barely mentioned in the record, caused impotence before the 1978 operations. But on the record before us, there is no significant evidence that this is so.

able sexual situation prior to the surgery" affects the extent of damages.

With respect to plaintiff's claim that the $15,000 for five years of pain and suffering and $15,000 for future pain and suffering is inadequate, we believe that these damages on this record approach being so grossly and palpably inadequate as to shock the court's conscience. See *Caskey v. Village of Wayland*, 375 F.2d 1004, 1007 (2d Cir.1967); see also *Gibbs v. United States*, 599 F.2d 36, 39 (2d Cir.1979) ("shock the judicial conscience" standard applied in Tort Claims Act case regarding claim of excessive damages). Of course, we recognize that it "is not our function to second guess the [trier of fact]," *Caskey*, supra, 375 F.2d at 1007, and that "measuring pain and suffering in dollars is inescapably subjective," *Gibbs*, supra, 599 F.2d at 39. Moreover, we recognize that $30,000 in absolute terms is not a paltry sum, and that, in fact, the total award to plaintiff and his wife was $101,000, plus costs and disbursements, although almost half of this was for medical expenses.

Nonetheless, we believe that there is enough objective evidence of pain and suffering to make plaintiff's claim of inadequacy on this element of damages a substantial one. First, plaintiff underwent three transurethral resections of his prostate in 1978; in addition, he had a fourth operation that year in which the Scott prosthesis was implanted. In 1981, he had to undergo a fifth operation to increase the size of the neck of his bladder. Moreover, he suffered a number of "minor" procedures as a direct result of defendant's conceded negligence. There is no question that in this period plaintiff experienced much pain and suffering. And there is no dispute that, as of the date of the trial, he had spent 75 days in hospitals.

Second, we regard the nature of the injuries suffered by plaintiff to be particularly deserving of a substantial award for pain and suffering. As noted by plaintiff's psychologist, "to control urine and feces is the first human achievement of self control and to lose it is a terrible blow to dignity and self-esteem for everybody." While defendant contends that any distress plaintiff suffered by incontinence "was largely eliminated by the successful implantation of the [prosthetic] device about seven months" after the 1978 resections, the distress of having no control over his bladder and the embarrassment of being soiled and odorous, for even seven months, makes $15,000 seem inadequate recompense. Moreover, plaintiff's past and future distress in having a prosthetic device implanted in him is another factor relevant to pain and suffering. In addition, plaintiff apparently still suffers from some involuntary voiding in using the prosthesis, and lives in fear that the substantial possibility of a failure of the prosthesis will become a reality, thus returning him to a state of total urinary incontinence. Indeed, the district judge assumed a failure rate of 40 or 50%.

In any event, we need not decide here whether the award to plaintiff for pain and suffering is inadequate as a matter of law since we are remanding this case for a new trial on the issue of damages generally. In that trial, we trust that the district court will carefully reconsider all elements of damages, not only those flowing from a finding that defendant's negligence caused plaintiff's impotence if such a finding is made. Since we are reversing and remanding for a new trial, we need not reach appellants' claim that they were denied a fair trial.

The judgment of the court is reversed, and the case is remanded for further proceedings in accordance with this opinion.